LOUISIANA CHEMICAL ASSOCIATION, et al., Plaintiffs-Appellants,

v.

Eula BINGHAM, Occupational Safety and Health Administration, and Raymond J. Donovan, Defendants-Appellees.

No. 80–3724.

United States Court of Appeals,
Fifth Circuit.
Unit A

Sept. 30, 1981.

Horace A. Thompson, III, Susan Brooks, New Orleans, La., Richard B. Herzog, Stephen A. Bokat, National Chamber Litigation Center, Inc., Washington, D. C., for plaintiffs-appellants.

Nathaniel I. Spiller, Dennis Kade, U. S. Dept. of Labor, Washington, D. C., for defendants-appellees.

Before CHARLES CLARK, TATE and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This case raises the issue of whether a records access requirement promulgated by the Secretary of Labor pursuant to Section 6(b) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 655(b) (1976), is in fact a "standard," authorized by Section 6 or is instead a "regulation," authorized under the inspection and record-keeping provisions of Section 8, 29 U.S.C. § 657. The distinction is decisive in locating jurisdiction for appeals from administrative action under the Act. Congress specifically vested exclusive jurisdiction to review Section 6 standards in the Courts of Appeals. 29 U.S.C. § 655(f) (1976). Since Section 8 is silent on appellate jurisdiction, the District Courts are the proper forums for initial review of "regulations." Administrative Procedure Act, 5 U.S.C. § 703 (1976); *Association of Nat'l Advertisers, Inc. v. F.T.C.*, 565 F.2d 237, 239 (2d Cir. 1977); *In Re School Bd.*, 475 F.2d 1117, 1119 (5th Cir. 1973). In resolving this narrow question, we confront the broader task of surveying the conceptual boundary drawn by Congress between standards and regulations.

## THE FACTS

On May 23, 1980, the Occupational Safety and Health Administration (OSHA) promulgated what it characterized as an "occupational safety and health standard" entitled "Access to Employee Exposure and Medical Records" (Records Access). The new requirements first appeared at 45 Fed.Reg. 35212 (1980) with extensive supplementary explanation. Controversy has arisen over OSHA's original characterization of the rule,[1] and even in its preamble to the new rule the Administration offered both Section 6(b) (standards) *and* Section 8 subsections (c) and (g) (regulations) of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 655(b), 657(c), and (g) (1976), as authority for the promulgation. *See* 45 Fed.Reg. 35212 (1980). OSHA persistently has described the rule as a Section 6(b) "occupational safety and health standard," however, and it has been duly codified at 29 C.F.R. § 1910.20 (1980). Part 1910 is that section of the Code reserved for OSHA standards.

The new rule, which applies to employment in all industries covered by the Act except agriculture, pertains to employers' medical records of employees' actual or potential exposure to a large number of toxic

---

1. In its original notice of proposed rulemaking, OSHA leaned more heavily on Section 8(c) and (g), adding Sections 6(b)(7), 9(b), and 13(c) as "other provisions" supporting its authority to issue the rule. *See* 43 Fed.Reg. 31371 (1978).

substances or other substances which are possibly toxic in particular circumstances or uses. An important feature of the requirement is that its definition of "toxic substances" incorporates the thousands of substances listed in the National Institute for Occupational Safety and Health (NIOSH) Registry of Toxic Effects of Chemical Substances (Registry). These substances range from everyday household items such as baking soda and sugar to noxious pesticides. It should be stressed that the Records Access rule makes no requirement that employers maintain exposure records. It merely requires that if such records are voluntarily kept they must be preserved and must be made available to employees, designated employee representatives, and OSHA authorities. Employers subject to the rule must preserve the records throughout the employees' employment and for thirty years thereafter.

Appellant Louisiana Chemical Association (LCA) and other interested parties[2] brought suit in the District Court seeking declaratory and injunctive relief against the Records Access rule and a companion rule, 29 C.F.R. § 1913.10 (1980), not issued as a standard and therefore not in question here. The court below determined that the rule was a standard promulgated pursuant to Section 6(b) and properly reviewable only in the Courts of Appeals. It accordingly dismissed the complaint for want of subject-matter jurisdiction. 496 F.Supp. 1188 (W.D.La.1980). LCA appeals, contending that OSHA has exceeded its statutory authority by mislabeling a Section 8 regulation as a Section 6 standard, and that the action properly lies in the District Court. We agree and reverse.

## THE AGENCY'S CHARACTERIZATION

■ We address at the outset OSHA's contention that this Court should defer to the agency's interpretation of its authority to act pursuant to Section 6(b). OSHA relies heavily on *E. I. duPont de Nemours &*

*Co. v. Train*, 430 U.S. 112, 134–35, 97 S.Ct. 965, 978–79, 51 L.Ed.2d 204 (1977), in which the Supreme Court found an agency's statutory construction "sufficiently reasonable to preclude [the Court] from substituting its judgment for that of the Agency." The Court there stressed that the agency's interpretation had received "the overwhelming support of the Courts of Appeals," 430 U.S. at 134, 97 S.Ct. at 978, a condition wholly absent here. Moreover, neither *duPont* nor any other case advanced by OSHA alters the general proposition, correctly observed by the court below, that while an agency's interpretation of its enabling legislation is a substantial factor for consideration in construing the statute, *Miller v. Youakim*, 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979), it remains "only one input in the interpretational equation." *Zuber v. Allen*, 396 U.S. 168, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345 (1969). "[T]he role of the agencies remains basically to execute legislative policy; they are no more authorized than are the courts to rewrite acts of Congress." *Talley v. Mathews*, 550 F.2d 911, 919 (4th Cir. 1977). *See also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213–14, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976); *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528 (1936).

## WHAT IS A STANDARD?

Section 3(8) of the Act defines an "occupational safety and health standard" as one that "requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places in employment." 29 U.S.C. § 652(8) (1976). There is no corresponding definition of the "regulations" that Section 8 empowers the Secretary of Labor to create respecting the activities—inspections, investigations, and recordkeeping—covered by that section. Herein lies our problem, for the Section 3(8)

---

**2.** In addition to LCA, which is an association of sixty-three chemical companies with facilities in Louisiana, appellants include three employ-

ees of LCA members and a specialist in occupational medicine who performs services for companies subject to the Records Access rule.

definition of standards if broadly interpreted encompasses virtually every requirement that OSHA has promulgated—or might ever promulgate—as a regulation.

For example, OSHA authorized Part 1903 of 29 C.F.R. (Inspections, Citations, and Proposed Penalties) strictly as a cluster of Section 8 regulations (see "authority" preceding 29 C.F.R. § 1903.1 (1980)), yet all of these prescribed actions are arguably "practices" or "methods" appropriate to "providing" safe employment. Under § 1903.16, employers must post citations for violations at or near the place where the violation occurred. Certainly, we need not stretch the bare words of Section 3(8) too far to overlap such a requirement.

Even more to the point, Part 1904 of 29 C.F.R., also promulgated pursuant to Section 8 of the Act, contains regulations requiring employers to keep a log and summary of occupational injuries and illnesses (§ 1904.2), to retain these records for five years (§ 1904.6), and to provide OSHA, employees and employee representatives with access to the records (§ 1904.7). These regulations are not only directly analogous to the Records Access rule now promulgated as a standard under § 1910.20; they glide perhaps just as easily within the "plain meaning" interpretation of Section 3(8) urged upon us by OSHA.

We may well wonder why the agency has chosen to issue some access rules as regulations and the one at issue here as a standard. The important question, however, is whether Congress empowered it to do so. If any regulatory practice authorized by Section 8 could be swept within the statutory definition of a Section 6 standard, the agency would be free to characterize provisions for "Inspections, Investigations, and Recordkeeping" as regulations or standards at its discretion. In turn, the agency would be totally controlling whether review would be in the District Courts or the Courts of Appeals.

The statute does not create this absolute authority in the agency. Congress authorized in Section 6 a special class of rules reviewable only in the Courts of Appeals.

It did not provide for any such accelerated procedure for review of recordkeeping and other rules promulgated as "regulations" under Section 8. We must recognize, therefore, that Congress intended to erect some jurisdictional distinction between Sections 6 and 8, and that allowing the agency to confer the benefits of accelerated review upon "regulations" merely by characterizing them as "standards" would frustrate that legislative intent.

The Supreme Court faced a similar problem in *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978), in which the Environmental Protection Agency sought to expand the benefits of a statutory limitation on judicial review by calling a regulation an "emission standard." A "survey of the totality of the statutory scheme" convinced the Court "that Congress intended, within broad limits, that 'emission standards' be regulations of a certain type, and that it did not empower the Administrator, after the manner of Humpty Dumpty in Through the Looking Glass, to make a regulation an 'emission standard' by his mere designation." 434 U.S. at 283, 98 S.Ct. at 572. Our own review of the Occupational Safety and Health Act's statutory scheme and its legislative history convinces us that the Records Access rule is not the type of requirement contemplated as a standard by Congress in Section 6(b), despite the far-reaching potential of the definition in Section 3(8).

Both sides in this dispute have been at great pains to propose a plausible definition of Section 6(b) standards in support of their positions. LCA insists that a standard must "prescribe physical conditions in the work place." Appellants' Brief at 13. It goes on to concede, however, that a standard might *include* a Records Access provision. *Id.* at 14 n.12. The crux of its suggested distinction is that a regulation "is at most only a preliminary step" towards safety, whereas "it is of the nature of a standard that compliance will of itself provide safety and health with regard to the substance or the equipment that is the subject of the standard." Standards "embody conclusions

from data, rather than simply the opportunity to examine data." *Id.* OSHA, on the other hand, insists upon the all-inclusive definition broadly applying the words of Section 3(8).

The court below read the legislative history of Section 6(b) in conjunction with the Supreme Court's recent decision in *Industrial Union Dept. v. American Petroleum Institute*, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980), to conclude "that Congress intended an Occupational Safety and Health Standard to possess two qualities: (1) it must address a particular hazard existing in a work environment; and (2) it must establish a measure against which the condition existing or the practices, means, methods, operations, or processes used in a work place may be compared for an immediate determination of whether the work place is safe with respect to the hazard addressed by the standard." 496 F.Supp. at 1192. Rejecting the "physical conditions" approach of LCA, the court found that the Records Access rule was a "practice" within

the Section 3(8) definition and also met—for jurisdictional purposes[3]—the court's own two-pronged test. Thus the court accepted OSHA's view that denial of access to employee medical records is arguably a "particular hazard."[4] *Id.*

■ While the court below started from a sound base for its analysis, we believe that it went awry in applying its helpful gloss of Section 3(8) to the Records Access rule. We are unable to agree that denial of access to exposure records which (a) OSHA does not require employers to keep in the first place, and (b) pertain to thousands of substances not even specified as "hazardous," constitutes the type of particular hazard contemplated by Congress in Section 6 of the Act and described by the Court in *American Petroleum Institute*. As explained below, we find that the basic function of the rule, rather than the exact nature of the "practices, means, methods, operations or processes" that it embodies,[5] distinguishes a standard from a regulation.

---

3. The court meticulously refrained from passing on whether the Records Access rule responded to an *actual* hazard *correctly* perceived by the Secretary to be reasonably necessary or appropriate to safety. "For purposes of determining whether the court has jurisdiction it is necessary only to find that the rule was formulated with what could reasonably be considered a hazard in mind." 496 F.Supp. at 1193.

4. *Compare, American Industrial Health Council v. Marshall*, 494 F.Supp. 941 (S.D.Tex.1980), *appeal stayed pending further administrative proceedings*, No. 80–1880 (5th Cir. Feb. 17, 1981). Plaintiffs in that case suggested that a standard "must impose enforceable legal obligations on identifiable employers to take concrete measures to reduce a specific hazard to employees." 494 F.Supp. at 943. It is unclear whether, in holding that the generic cancer policy questioned by plaintiffs was in fact a standard rather than a regulation, the district court rejected this definition entirely or thought that the cancer policy complied with it anyway. In any event, the court leaned heavily on its finding that "the determinations underlying promulgation of the standard are essentially the same as those underlying other standards promulgated by the agency." It identified those determinations as follows: (1) evaluation of the potential health hazard associated with particular substances; (2) assessment of what kinds of protections must be invoked to guard

against the health hazard, and how stringent the protections must be; and (3) determination of what level of exposure is feasible for industry compliance. 494 F.Supp. at 944 & n.6.

Naturally, we express no opinion on the merits of the resolution in *American Industries*. Even if that case were before us, the generic cancer policy at issue in that litigation, *see* 45 Fed.Reg. 5001 (1980), is sufficiently dissimilar from the Records Access rule that we could not classify it without additional analysis of its structure and purpose.

5. As the court below recognized, words such as "practices" are capable of variant interpretations and may encompass any type of substantive or administrative requirement. "For example, if it was the practice of an employer to use potentially lethal substances in a particular manufacturing process without informing an employee of the dangers to which he was exposed, the practice would pose an occupational hazard which could be reduced to adherence to a standard requiring that employees be informed of the risk." 496 F.Supp. at 1192. We note in passing that this is precisely the function—response to a particular hazard already identified—that a standard should perform. As we discuss below, however, the Records Access rule serves a different and much broader purpose.

The legislative history of Sections 6 and 8 is far from clear, and both sides have quoted freely from it. We discern in the Senate Report, however, an implication that Congress conceived a standard as a remedial measure addressed to a specific and already identified hazard, not as a purely administrative effort designed to uncover violations of the Act and discover unknown dangers. In short, standards should aim toward correction rather than mere inquiry into possible hazards.[6] The tone of the language in the legislative history of Section 6 indicates concern for the actual and specific rather than for the speculative. Thus, Congress intended that standards "include requirements regarding the use of labels or other forms of warning to alert employees to the *hazards covered by the standard....*" and that standards ensure that no employee suffer adverse consequences "by reason of exposure *to the hazard involved*." Senate Report No. 91–1282 (91st Cong., 2d Sess.), *reprinted in* U.S.Code Cong. & Admin.News 1970, 5177 at 5181–82 (emphasis added). The very words of the statute refer to "the hazard dealt with by such standard," 29 U.S.C. § 655(b)(5) (1976), and "the hazard covered by the standard," *id.* § 655(b)(6)(A)(iii).

This interpretation draws support from the Supreme Court's recent opinion in *American Petroleum Institute, supra.* There the Court was not deciding a jurisdictional issue of characterization, but was considering the test by which the Courts of Appeals are to evaluate challenges to standards on the merits. In holding that the special mandate of Section 6(b)(5) concerning standards on toxic materials remains subject to the more general definitional constraints of Section 3(8), the Court insisted that standards can address only serious hazards: "[B]efore he can promulgate *any* permanent health or safety standard, the Secretary is required to make a threshold finding that a place of employment is unsafe—in the sense that significant risks are present and can be eliminated or lessened by a change in practices." 448 U.S. at 642, 100 S.Ct. at 2864. This court has since interpreted *American Petroleum Institute* to mean that OSHA standards "must be reasonably essential or at least reasonably efficacious in reducing a significant risk of material harm." *Texas Independent Ginners Ass'n v. Marshall*, 630 F.2d 398, 410 (5th Cir. 1980). Thus, while courts hardly can decide the issue on the merits before establishing their jurisdiction,[7] they must determine whether the challenged rule reasonably purports to correct a particular "significant risk" or instead is merely an enforcement or detection procedure designed to further the goals of the Act generally.

## THE RECORDS ACCESS RULE IS A SECTION 8 REGULATION

All indices, including OSHA's own past practice,[8] suggest that the Records Ac-

---

**6.** Certainly the history indicates that a standard may *include* procedural devices for monitoring and improving responses to a particular hazard. Consider, for example, the statement that "such standards would *also* prescribe... in the case of toxic substances or harmful physical agents, requirements for monitoring conditions or measuring employee exposure as may be necessary to protect employees' health." S.Rep. No. 91–1282 (91st Cong., 2d Sess.), *reprinted in* U.S.Code Cong. & Admin. News 1970, at 5183 (emphasis added).

**7.** The Supreme Court has recognized in a similar context the difficulties of disengaging the jurisdictional disputes from the merits. *See E. I. duPont de Nemours & Co. v. Train*, 430 U.S. 112, 125, 97 S.Ct. 965, 973, 51 L.Ed.2d 204 (1977), in which Justice Stephens observed how "the issue of jurisdiction to review the regulations is intertwined with the issue of [the agency's] power to issue the regulations." (Footnote omitted).

**8.** We note that OSHA appears to have encountered little difficulty in instituting this distinction up to now. All of its occupational safety and health standards codified in Part 1910 of the C.F.R. have proposed remedies for particular hazards entailing at least arguably significant risks. Subjects of their specifications have ranged from protection for floor openings (§ 1910.23) to acceptable levels of ionizing radiation (§ 1910.96) to special requirements for particular industries (§§ 1910.261–.265). By comparison, Parts 1903 (Inspections, Citations, and Proposed Penalties) and 1904 (Recording and Reporting Occupational Injuries and Illnesses) have outlined across-the-board regula-

cess rule is among the more general class of enforcement and detection regulations contemplated by Congress in Section 8. Referring specifically to Section 8(c) of the Act, the Senate Committee announced its expectation that the Secretary would "make every effort, through the authority to issue regulations and other means, to obtain complete data regarding the occurrence of illnesses, including those resulting from occupational exposure which may not be manifested until after the termination of such exposure." It similarly invoked Section 8(c) in directing the Secretary "to issue regulations specifying the records to be kept by employers who are required to monitor employee exposures to potentially toxic materials or harmful physical agents." Senate Report No. 91–1282 (91st Cong., 2d Sess.), *reprinted in* U.S.Code Cong. & Admin.News (1970), at 5193–94. OSHA itself has declared that the Records Access rule "thus implements the mandate of [S]ection 8 and the general mandate of other provisions of the [A]ct . . . ." 43 Fed.Reg. 31372 (1978).

Just as the rule fits neatly within the language and history of Section 8, it fails to

exhibit the most important features we have described as distinguishing a standard. A standard performs the function of correcting or ameliorating a particular hazard, which the Supreme Court has defined as a "significant risk"; yet the risk posed by denial of employee access to medical and exposure records involving the more than 30,000 substances in the NIOSH Registry hardly qualifies, even facially, as either particular[9] or significant. The risk, after all, stems originally from the toxic substance, and denial of access to records cannot present any risk unless the substance to which the records pertain is hazardous. Many of the substances covered by the rule through its incorporation of the Registry may not present any risk at all under normal and routine circumstances. As NIOSH explains, "The absence of a substance from the Registry does not imply that the substance is non-toxic, and thus non-hazardous, and more than the presence of a substance in the Registry indicates that the substance is hazardous in common use." NIOSH Registry xiv (1978).[10] OSHA apparently does

tions for the conduct of inspections (§ 1903.7), the posting of citations (§ 1903.10), and penalties for falsification or failure to keep records (§ 1904.9). By far the closest analogues to the Records Access rule are the sections regulating the keeping of a log and summary of occupational injuries and sicknesses (§ 1904.2), record retention (§ 1904.6), and access (§ 1904.7). Why characterize a rule demanding the making of records as a regulation and one merely requiring preservation of records voluntarily made as a standard? In asking for deference to its label, OSHA must act in accordance with the admonition that the weight afforded an agency's interpretation must depend in part upon "its consistency with earlier and later pronouncements . . . ." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

9. While inclusion of 30,000 substances within one standard appears unrealistic at a glance, we do not inaugurate a numbers game as a tool for interpreting § 6(b) of the Act. OSHA already has implemented a standard on air contaminants that governs exposure to approximately 400 substances. 29 C.F.R. § 1910.1000 (1980). Our problem with calling the Records Access rule a standard lies not so much in the number of substances it includes as with our perception of its basic function: enforcement and detection. Lack of particularity is merely

one aspect of this function. Since a standard covering a substance of recognized toxicity normally will specify protective equipment, contamination control restrictions, handling instructions, and emergency procedures (*see, e. g.,* 29 C.F.R. §§ 1910.1003 (4–Nitrobiphenyl) and 1910.1004 (alpha-Napthylamine)), the number of substances treated within one standard is likely to remain small. Procedures designed purely for enforcement and detection, on the other hand, may apply uniformly to an unlimited number of substances or industries. Even if all of the Registry substances were truly hazardous, therefore, the Records Access rule would not qualify as a standard. It offers no guidelines for protecting workers from each substance; it merely institutes a broadly applicable procedure by which employees and OSHA officials may detect incidents of overexposure.

10. The Editor continues, "it must be reemphasized that the entry of a substance in the Registry does not automatically mean that it must be avoided. . . . Thus, the Registry lists many substances that are common in everyday life and are in nearly every household in the United States." NIOSH Registry xiv (1978). *Compare* Justice Stephens' argument in *American Petroleum Institute*, supporting his insistence that a threshold finding of significant risk must pre-

not consider these substances, as a group, sufficiently hazardous to warrant a requirement that employers provide medical examinations to exposed employees and keep (rather than merely preserve) exposure records, although it has imposed such requirements in prior standards on toxic substances. *See, e. g.,* 29 C.F.R. § 1910.1010(f) and (g) (requiring exposure reports and medical examinations to monitor effects of benzidine).

The rule's definition of "toxic" also sweeps up any substance that has yielded "positive evidence" of a health hazard in "human, animal, or other biological testing," as well as any accompanied by a data sheet "indicating that the material *may* pose a hazard to human health." *Id.* § 1910.20(b)(11)(iii) and (iv) (emphasis added). The unavoidable conclusion is that the primary function of the rule is something other than correction of a significant risk that OSHA already has identified.

The Records Access rule is a regulation aimed primarily at possible detection, over a long period, of significant risks not yet covered by standards. Recognizing that "OSHA's limited resources and the time-consuming nature of the standard-setting process allow for the comprehensive regulation in the foreseeable future of only a very small percentage of the toxic chemicals found in the workplace," the agency has attempted in this rule to achieve immediate gains on a wider front. 45 Fed.Reg. 35258 (1980), OSHA's express purpose is to enlist workers in the discovery process:

> Sound public policy dictates that workers be afforded a central role in the *detection and solution* of health problems, as there are no assurances that anyone else will protect their health with equal vigor or determination.

> Access to exposure and medical information will enable workers and their representatives to become directly involved in the *discovery and control* of occupational health hazards. Access will enable workers to *uncover patterns* of health impairment and disease.

*Id.* at 35213 (emphasis added). The agency's objectives are commendable. Undoubtedly substantial numbers of the substances covered by the rule are potentially hazardous under certain conditions and some will prove the subjects of future standards. The recordkeeping and access provisions of Section 8, after all, "serve as essential complements to those contained in Section 6...." Senate Report No. 91–1282 (91st Cong., 2d Sess.), *reprinted in* U.S.Code Cong. & Admin. News 1970, at 5194. We express no opinion as to the wisdom or legality of the Records Access rule as devised by OSHA in furtherance of these aims. We merely hold that courts must evaluate and apply it under the statutory procedures applicable to a regulation pursuant to Section 8 rather than under Section 6(b) as a standard.

## REVIEW IN THE DISTRICT COURT

■ We conclude by observing that we remain unpersuaded by the agency's argument that the Records Access rule, even if not a standard in its own right, should be reviewable directly in the Courts of Appeals because it is "closely related to substance-specific OSHA standards." Brief of Defendants-Appellees at 29. Acceptance of this proposition would permit the agency to bootstrap virtually every recordkeeping regulation into the accelerated review procedure reserved by Congress for standards alone. Moreover, OSHA's reliance upon a judicially created "policy against bifurcated review" is misplaced here. All of the cases cited by OSHA on this point contain extensive analyses of statutory schemes wholly different from the one at issue here and conclude that those acts express such a poli-

---

cede issuance of a standard: "There are many activities that we engage in every day—such as driving a car or even breathing city air—that entails some risk of accident of material health impairment; nevertheless, few people would consider these activities 'unsafe.' Similarly, a work place can hardly be considered 'unsafe' unless it threatens the workers with a significant risk of harm." 448 U.S. at 642, 100 S.Ct. at 2864.

---

cy.[11] We discern no such policy in the language or history of this statute, nor in OSHA's prior actions under it. On the contrary, we have already expressed our view that Congress fashioned two entirely different modes of legal requirements in this statute, with correspondingly distinct methods for review: standards addressed to particular hazards already identified receive direct review in the Courts of Appeals; the important but perhaps less urgent procedures for detection and enforcement must obtain initial review in the District Courts.[12]

We also do not agree with the agency's contention that requiring plaintiffs to challenge a broad enforcement or recordkeeping regulation in one forum and conforming amendments to existent standards in another will produce an "anomalous result." Any conforming amendment that properly appends recordkeeping or other purely procedural requirements to an already promulgated standard must still address the particular hazard that is the subject of that standard. While some overlap is possible, any challenge to such a focused, auxiliary procedure within the standard would raise more specific and restricted factual and legal issues than would an appeal from a pervasive regulatory procedure like the Records Access rule. Indeed, it would likely bog down a Court of Appeals' review of a standard if the Court was required to afford concurrent consideration of a regulatory procedure involving thousands of substances not even mentioned in the standard. Moreover, the conforming amendment presumably would graft onto the Section 6(b) standard as much of the broader Section 8 regulation as applies to that particular hazard. For example, OSHA has incorporated the requirement of recordkeeping and record access into its standard covering asbestos. 29 C.F.R. §§ 1910.1001(i)(2) and (j)(6)(ii) (1980). Any plaintiffs challenging that standard may seek and obtain in the Courts of Appeals review of that recordkeeping requirement as part of the review of the standard.

Congress has set the appellate scheme here at issue. We must follow it. We reverse and remand this case to the jurisdiction of the district court for consideration on the merits.

REVERSED and REMANDED.

**11.** For example, the special jurisdictional scheme provided by § 509(b) of the Federal Water Pollution Control Act amendments of 1972, 33 U.S.C. § 1369(b) (1976), was the subject of scrutiny in *Crown Simpson Pulp Co. v. Costle*, 445 U.S. 193, 100 S.Ct. 1093, 63 L.Ed.2d 312 (1980), *E. I. duPont de Nemours & Co. v. Train*, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977), and *Virginia Electric & Power Co. v. Costle*, 566 F.2d 446 (4th Cir. 1977). In *Crown Simpson*, the Court construed that section's provisions for direct review of agency "permit denials" to include the agency's veto of a state issued permit. 445 U.S. at 196–97, 100 S.Ct. 1094–95. In *duPont*, the Court's primary determination that § 301 of the Act "unambiguously" authorized the agency action in question, 430 U.S. at 127, 97 S.Ct. at 974, "necessarily resolve[d] the jurisdictional issue as well," since § 509(b) expressly authorized special review of § 301 promulgations. 430 U.S. at 136, 97 S.Ct. at 979. The court in *Virginia Electric* seized upon § 509(b)(1)(e)'s catch-all phrase— "and other limitations"—to bring § 316(b) regulations within the jurisdictional exception. In sum, each of these decisions relied upon the unique structure of the Water Pollution Control Act rather than upon any general policy against bifurcated review.

**12.** The court below supported its dismissal of jurisdiction over the Records Access rule by suggesting that Congress sought to focus judicial expertise in occupational safety in the Courts of Appeals and to reduce potentially conflicting rulings. 496 F.Supp. at 1193. While this may have played a part in congressional deliberations, it does not explain why other recordkeeping regulations, such as 29 C.F.R. § 1904.2, remain subject to initial review in District Court. The commentary cited by the District Court goes on to observe that administrative statutes containing jurisdictional exceptions "may also be designed to expedite implementation of an agency's program by reducing the delays associated with judicial review." Note, Jurisdiction to Review Federal Administrative Action: District Court or Court of Appeals, 88 Harv.L.Rev. 980, 983 (1975). Thus, we may as plausibly surmise that Congress sought to hasten review of measures responding to specific dangers already identified.