**MID–LOUISIANA GAS COMPANY, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**CONSOLIDATED GAS SUPPLY CORPORATION, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Nos. 80–3804, 80–4010.**

United States Court of Appeals, Fifth Circuit.*

Unit A

Dec. 23, 1981.

Rehearing and Rehearing En Banc Denied Feb. 5, 1982.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Donald W. Seeley, Jr., Alan C. Wolf, New Orleans, La., for Mid Louisiana Gas Co.

Peter J. Wall, Denver, Colo., Larry D. Hall, Vice President, Hastings, Neb., William W. Brackett, Daniel F. Collins, Terry O. Vogel, Richard W. Miller, Jr., Brackett & Collins, P. C., Washington, D. C., for Kansas-Nebraska Nat. Gas Co.

Kim Martin Clark, William J. Grealis, Akin, Gump, Strauss, Hauer & Feld, Washington, D. C., for Northwest Pipeline Corp.; Donald C. Shepler, Northwest Pipeline Corp., Salt Lake City, Utah, of counsel.

Morris Kennedy, L. Eugene Dickinson, Ashland, Ky., James D. McKinney, Jr., William R. Mapes, Jr., Ross, Marsh & Foster, Washington, D. C., for Kentucky West Virginia Gas Co.

Charles J. McInerney, Senior Vice President and Gen. Counsel, Detroit, Mich., William W. Brackett, Daniel F. Collins, Terry O. Vogel, Brackett & Collins, P. C., Washington, D. C., for Michigan Wisconsin Pipe Line Co.

Kevin J. Lipson, Karol Lyn Newman, John E. Holtzinger, Jr., Morgan, Lewis & Bockius, Washington, D. C., for Consolidated Gas Supply Corp.

Jerome Nelson, Sol. and Acting Gen. Counsel, Auburn L. Mitchell, Susan Tomasky, Washington, D. C., for Federal Energy Regulatory Commission.

Arnold D. Berkeley, Richard I. Chaifetz, Bruce J. Wendel, Washington, D. C., for Arizona Electric Power Co-op. Inc.

George J. Meiburger, Frank X. Kelly, Washington, D. C., John B. Will, Deborah K. Vinson, Omaha, Neb., for Northern Natural Gas Co.

Philip J. Mause, Norman A. Pedersen, Kadison, Pfaelzer, Woodward, Quinn & Rossi, Washington, D. C., for Public Service Commission of Wisconsin; Steve Schur, Public Service Commission of Wisconsin, Madison, Wis., of counsel.

Frank J. Kelley, Atty. Gen., Robert Derengoski, Sol. Gen., Lansing, Mich., Ronald D. Eastman, Jeffrey D. Komarow, Cadwalader, Wickersham & Taft, Washington, D. C., for State of Michigan and the Michigan Public Service Commission.

Peter H. Schiff, Gen. Counsel, Albany, N. Y., Alexander M. Peters, Wilner & Scheiner, Richard A. Solomon, Washington, D. C., for Public Service Commission of State of N. Y.

Philip C. Wrangler, Houston, Tex., for Exploration and Production Division of Southern Nat. Gas Co.

William M. Lange, P. Michael Koenig, Colorado Springs, Colo., for Colorado Interstate Gas Co.

Richard C. Green, C. Frank Reifsnyder, Hogan & Hartson, Washington, D. C., Richard Owen Baish, Donald J. MacIver, Jr., Scott D. Fobes, Dennis J. Dwyer, El Paso, Tex., Raymond N. Shibley, Brian D. O'Neill, George M. Knapp, LeBoeuf, Lamb, Leiby & MacRae, Washington, D. C., for El Paso Nat. Gas Co., Miriam Vogel Gold, CIBA–GEIGY Corp., Ardsley, N. Y., of counsel.

Before CHARLES CLARK, GARZA and SAM D. JOHNSON, Circuit Judges.

**CHARLES CLARK, Circuit Judge:**

Petitioning pipeline producers of natural gas seek review of two issues concerning the scope and administration of the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. § 3301 et seq. (Supp. III 1979). Their initial claim is that the Federal Energy Regulatory Commission (Commission) incorrectly determined in Order No. 58 that the pricing structure established by the NGPA was not applicable to most gas produced by pipeline companies. Because we find this claim correct, we do not reach the producers' alternate claim that, if the Commission retained jurisdiction to establish the price of such gas, it abused its discretion in Order No. 98 by denying higher prices to gas which had previously been priced on a cost-of-service basis.

## I.

Prior to the NGPA, the price for both the production and transportation of gas was regulated by the Commission under the Natural Gas Act of 1938 (NGA), 15 U.S.C. § 717 (1976). Under the NGA, the cost of gas which was bought by the pipelines for resale in interstate commerce was set according to area or national rates. Although the majority of gas transported by pipelines was bought from independent producers, some pipelines also produced their own gas, which was combined with gas bought from independent producers, and transported to their customers downline. The Commission treated the pipelines' intracorporate transfer of its own production as if it had been bought from another entity and determined its "cost" to the pipeline by applying the same area or national rates the Commission applied to independently produced gas. The Commission determined the pipelines' sales price to its customers on a cost-of-service basis.[1]

1. Basically, cost-of-service pricing adds the costs required to operate and maintain the pipeline to the cost of both the gas purchased from independent producers and the gas produced by the pipeline itself, then calculates and includes an additional amount to allow reasonable return on the pipeline's investment. The Commission initially had determined the cost of pipeline production on a cost-of-service basis, but began applying area rates to pipeline production in 1969. However, it continued to price pipeline production from leases acquired

The fuel shortages of the 1970s revealed two flaws in the regulation of gas production. The first appeared when the area and national rates established by the Commission for gas sold on the interstate market fell markedly below the price available for gas sold on the intrastate market, which was not regulated by the Commission. The price disparity between the two markets skewed the distribution of gas and resulted in shortages of gas available for interstate sale. *See Air Products & Chemicals, Inc. v. FERC*, 650 F.2d 687, 705 (5th Cir. 1981). The second became apparent when the area and national rates established by the Commission did not provide a sufficient incentive to encourage exploration for new sources of gas. *See Pennzoil Co. v. FERC*, 645 F.2d 360, 367 n.13 (5th Cir. 1981). These two problems resulted in enactment of the NGPA. While the NGPA did not disturb the Commission's jurisdiction over the prices a pipeline could charge its customers, it did take away from the Commission the right to fix most prices paid for the production of natural gas.

In the NGPA, Congress defined several categories of natural gas and set maximum lawful prices for the "first sale" in each. The pipelines claim that because Congress intended for the NGPA to apply to both pipeline and independent production, the Commission's order defining "first sale" conflicts with the NGPA.

## II.

The NGPA generally defines "first sale" as "any sale of any volume of natural gas," to a specified purchaser. 15 U.S.C. § 3301(21)(A). However, this general definition is subject to a qualified exception which is crucial to the issue presented here. The subsection following the general definition provides that "first sale" shall *not* include "the sale of any volume of natural gas

by any interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof, unless such sale is attributable to volumes of natural gas produced by such interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof." 15 U.S.C. § 3301(21)(B).

In Order No. 58, the Commission assumed that the sale referred to by section 3301(21)(B) was a transfer by the pipeline to its customers. The Commission found that such a transfer was not a "first sale" unless the gas transferred was exclusively attributable to the pipeline's own production. Thus, it provided that if a pipeline commingled gas produced by it with gas produced by other entities, the pipeline was not entitled to NGPA prices for the gas it produced.

Because sales by pipelines are normally comprised of commingled gas, the Commission acknowledged that its regulation denied NGPA prices to virtually all pipeline produced gas and that FERC would retain jurisdiction under the NGA to set the price of such gas. The Commission justified its regulation because it intruded the least into state regulation and because it was less difficult to administer.

Under the NGA, regulation of retail sales by interstate pipelines, intrastate pipelines and local distribution companies had been committed to the states. The Commission found that applying NGPA prices to such sales, particularly those by intrastate pipelines and local distribution companies, would supplant an area of regulation traditionally controlled by the states. The Commission also found that applying NGPA prices to pipeline customer sales of natural gas would disrupt the method it had traditionally used to factor transportation and other costs into the price charged for natural gas. Although treating the transfer from the production to the transportation

---

prior to 1969 on a cost-of-service basis. *See Chicago v. FPC*, 458 F.2d 731 (D.C.Cir.1971), *cert. denied*, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972). The Commission subsequently provided that pipeline production on old leases from wells begun after January 1, 1973, would receive nationwide rates. *See*

*Shell Oil Co. v. FPC*, 520 F.2d 1061 (5th Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976). These exceptions to the application of area or national rates represent historical practices the effect of which is continually diminished as early wells cease producing gas. They do not affect our decision.

division of the pipeline as a first sale would have eliminated the problems noted by the Commission, the Commission declined to do so because it had not previously treated an intracorporate transfer as a sale.[2]

### III.

We have previously recognized that "an agency's interpretation of its own statute is generally given deference . . . ." *Columbia Gas Development Corp. v. FERC*, 651 F.2d 1146, 1155 (5th Cir. 1981). We have also recognized that a greater degree of deference results from such factors as (i) a long standing interpretation which has not been disturbed by congressional action, *see International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 566 n.20, 99 S.Ct. 790, 800, 58 L.Ed.2d 808 (1979); *Sanchez v. Schweiker*, 656 F.2d 966, 970 (5th Cir. 1981) (per curiam), (ii) the fact that "the interpretation concerns matters within the agency's expertise," *Adkins v. Hampton*, 586 F.2d 1070, 1073 (5th Cir. 1978); *accord Office of Consumers' Council v. FERC*, 655 F.2d 1132, 1141 (D.C.Cir.1980), and (iii) the fact that a contemporaneous interpretation of the statute suggests that the agency personnel interpreting the act had a hand in its development. *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 689, 74 S.Ct. 794, 803, 98 L.Ed.1035 (Douglas, J. dissenting). While the presence of these factors argues for greater deference, their absence suggests that a court need not accord as much deference as it otherwise would and indeed may rely on its own expertise in construing the intent of Congress. *See Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 42 n.27, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (1977); *Louisiana Chemical Association v. Bingham*, 657 F.2d 777, 779 (5th Cir. 1981).

In *Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977), the Supreme Court recognized that when Congress "expressly delegated to [an agency] the power to prescribe standards" the resulting regulations should not be set aside by a court "simply because it would have interpreted the statute in a different manner." The Court distinguished legislative regulations, which are issued "pursuant to statutory authority and . . . implement the statute, as, for example, the proxy rules issued by the Securities and Exchange Commission," from merely interpretative regulations. *Id.* at 426 n.9, 97 S.Ct. at 2405 n.9. With respect to interpretative regulations, the Court noted that a lesser degree of deference is due, and stated "[v]arying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position and the nature of its expertise." *Id.*

Applying these factors to the present case, we find that the Commission's definition of "first sale" in Order No. 58 has not yet received the sanction which comes from long years of application by the agency and tacit congressional acceptance.[3] Moreover, this definition does not concern an area particularly within the agency's expertise. The Commission concedes that the concept of "first sale" is new to energy regulation, having been initially introduced by President Carter in a message to Congress. Defining this term does not bring into play the experience which the agency has gained in administering the NGA nor does this definition draw on the agency's expertise in dealing with the technical problems associated with energy regulation. The one factor which augments the deference due the Commission is its contemporaneous interpretation of the statute. The Commission

---

2. In Order No. 98, the Commission, acting under the NGA authority it had recognized in Order No. 58, established prices for interstate pipeline sales which come from mixed volumes of pipeline and independent producer gas. The Commission allowed pipelines whose production had previously been priced according to area or national rates to sell gas at NGPA prices. It refused, however, to extend NGPA prices to pipelines whose production had been priced on a cost-of-service basis.

3. 15 U.S.C. § 3411(b) authorizes the Commission "to define, by rule, accounting, technical, and trade terms used in this chapter."

did have first-hand knowledge of the problems leading to the passage of the NGPA. Yet, the weight of this factor is diminished since the Commission has admitted that it had no input into the development of the term "first sale." In sum, these factors fall far short of demanding a deference to the Commission's interpretation of the statute which could challenge the clear meaning of a statute as revealed by its language, purpose and history. *International Brotherhood of Teamsters v. Daniel*, 439 U.S. at 566 n.20, 99 S.Ct. at 800; *see Mohasco Corp. v. Silver*, 447 U.S. 807, 100 S.Ct. 2486, 2496, 65 L.Ed.2d 532 (1980); *Louisiana Chemical Association v. Bingham*, 657 F.2d 777, 779 (5th Cir. 1981).

## IV.

"The starting point in every case involving the construction of a statute is the language itself." *International Brotherhood of Teamsters v. Daniel*, 439 U.S. at 558, 99 S.Ct. at 795. Sections 3311–3319 of the NGPA set a price for the "first sale" of natural gas in defined categories. Section 3301(21)(B) provides: (i) the sale of gas by a pipeline is not a "first sale," (ii) unless the sale was attributable to the pipeline's own production.

The first part of section 3301(21)(B) has a clear purpose. If its denial of "first sale" status to pipeline sales had not been included in the NGPA, pipelines which bought gas produced by independent producers and then resold it would have been involved in two "first sales," once as purchaser from the independent producer and then as seller to its customer. The restriction operates to eliminate this possibility by denying "first sale" status to the downstream sale.

The Commission's interpretation of section 3301(21)(B) would effectively read the second part of this subsection out of the NGPA. By over-stressing the first provision that sales by a pipeline are not first sales, the Commission would render the unless clause of subsection (B) a nullity. *See Ideal Mutual Insurance Co. v. C.D.I. Construction, Inc.*, 640 F.2d 654, 658 n.7 (5th Cir. 1981).

This second part of subsection (B) has a purpose equally as clear as the first. As we show below, NGPA contemplates that the pipeline is both a buyer and a seller as to its own production. Blotting out the unless clause would mean the sale it makes of natural gas to itself in an intracorporate transfer would be excluded from NGPA in the same way the sale to its downstream customer is excluded. If this construction is placed on the Act, all natural gas produced by a pipeline would be denied "first sale" status under NGPA. Nothing in the language used here or elsewhere in the NGPA suggests any intent to deny NGPA pricing to natural gas just because it is produced by a pipeline. To the contrary, the unless clause of subsection (B) can only have meaning if it is interpreted as granting "first sale" status to gas which is attributable to pipeline production. The pipeline's later sale of this gas to its customer would, of course, still be excluded from "first sale" treatment by the first part of the subsection.

The Commission claims that its interpretation of first sale is consistent with both the purposes of the statute and the legislative history. We disagree. Two of the overriding purposes of the NGPA were to eliminate the dual interstate and intrastate market for natural gas and to provide higher prices to encourage production. *See* H.R. Doc. No. 95–128, 95th Cong., 1st Sess. 5 (1977). Neither of these purposes is served by creating a distinction between pipeline and independent producers.

█ In achieving the goal of increasing natural gas production, pipeline producers deserve the price encouragement of NGPA no less than other producers. The Commission contends that it has encouraged increased production by extending NGPA prices to some pipeline producers in Order No. 98. This argument is sophistic. The Commission's duty is to administer the law Congress passed in light of the purposes for which it was passed. It is not an agency's prerogative to alter a statutory scheme even if its alteration is as good or better than the congressional one. The fact that

the agency gives back all or part of what it takes from the law's grant in no way justifies departure from the congressional purpose in the first instance.

With respect to the goal of eliminating a dual market structure, the Commission's order would exclude virtually all interstate pipeline, intrastate pipeline and local distribution company production from the NGPA's uniform prices. While the Commission would retain control of interstate pipeline production under the NGA, the effect of its order would be to leave intact state regulation of intrastate pipeline and local distribution company production. The intrastate market for such production would thus be perpetuated. This would leave a substantial vestige of the dual market structure Congress sought to eliminate.

The legislative history of section 3301(21) does not illuminate this issue. Congress did not explain its definition of first sale either in the committee reports that accompanied the various drafts of the NGPA or in the discussions that occurred in each house.

The Commission would support its interpretation by noting that the term "first sale" is used in a subchapter titled Wellhead Pricing and that first sales are referred to as "wellhead" or "field" sales in the legislative history. The Commission reasons that because a sale by a pipeline to its customer cannot be a wellhead sale, Congress must have intended to deny pipeline production first sale status. The Commission's Order No. 58 is inconsistent with this reasoning because it recognizes that non-wellhead sales may be first sales. Order No. 58 would allow as a first sale a downline sale to a pipeline customer if the sale was exclusively attributable to pipeline production despite the fact that such a sale is no more a wellhead sale than is any other pipeline customer sale.

More importantly, the legislative history noted by the Commission conflicts with a premise which underlies Order No. 58. The Commission asserts that a problem is created by extending first sale status to pipeline production. The problem it perceives derives principally from its assumption that the first sale by the pipeline producer must be the sale to a customer downline. The legislative history equating a first sale with a wellhead or field sale suggests, however, that Congress intended the sale by the producer of the gas to be the first sale. In the context of pipeline production, this would mean that the intracorporate transfer from the production division of the pipeline to the transportation division of the pipeline would constitute the first sale. If the Commission had equated this intracorporate transfer with the acquisition of pipeline gas from an independent producer the "problems" it perceived and sought to solve in Order No. 58 would not have arisen.

Other provisions in the statute and such relevant legislative history as does exist persuade us that Congress both intended to accord pipeline production first sale status and contemplated that the intracorporate transfer would be treated as a first sale. Subchapter II of the NGPA provides for incremental pricing by the pipelines. Congress directed that pipelines pass through to certain industrial users the higher first sale acquisition costs paid by the pipelines for natural gas under NGPA. In defining first sale acquisition costs, Congress stated that the cost would be the price paid in any first sale. *See* 15 U.S.C. § 3343(b)(1)(A). Additionally, Congress provided that for "any natural gas produced by any interstate pipeline or any affiliate of such pipeline, the first sale acquisition cost of such gas shall be determined in accordance with rules prescribed by the Commission." 15 U.S.C. § 3343(b)(2). By referring to the "first sale acquisition cost of *such* gas," in terms of "any gas produced by any interstate pipeline," Congress must have contemplated that any gas produced by a pipeline would be subject to a first sale. Moreover, the fact that Congress provided that the "first sale acquisition cost" of pipeline produced gas would, like the first sale price paid to independent producers, be passed along to the pipeline's ultimate customers suggests that both prices were to be treated in a similar manner. Congress contemplated

that the first sale acquisition cost for both pipeline and independent production would be treated as the cost of the gas to the pipeline in determining, under the cost-of-service method, the price charged by the pipeline. The first sale thus appears to refer to the intracorporate transfer.

The Commission contends that if Congress had intended pipeline production to be subject to first sales, it would not have treated pipeline production separately from other production for which there is a "price paid." This distinction, however, merely reflects Congress' awareness that technically an intracorporate transfer involves no price paid. It would appear that Congress intended for the Commission to apply NGPA prices as the "cost" of this gas to the pipeline, just as the Commission had applied area and national rates under the NGA to determine the "cost" to the pipeline of pipeline produced gas.

Support for the proposition that the intracorporate transfer constitutes a first sale is contained in the conference committee report. In discussing the Commission's power to define terms in the NGPA, the Committee stated:

> the Commission may define terms such as "transfer for value" used in the definition of first sale; it may also establish rules applicable to intracorporate transactions under the first sale definition.

H.R.Rep. No. 95–1752, 95th Cong., 2d Sess. 116, *reprinted in* [1978] U.S.Code Cong. & Ad.News 8800, 9033. The Commission contends that this statement only suggests that the Commission may issue regulations defining an intracorporate transaction as a first sale, not that it is required to do so. We reach a different conclusion. This comment assumes that intracorporate transactions will fall within the first sale definition. The decision which Congress committed to the Commission's judgment was whether regulations were necessary to govern those transactions. The fact that the Commission was permitted to regulate intracorporate transactions under the first sale definition does not imply that Congress did not intend in the first instance for them to be treated as first sales.

Treating this transfer as a first sale would obviate the difficulties which prompted the Commission to promulgate Order No. 58. The Commission had been concerned that normally only a portion of a sale by a pipeline to its customers downline would be attributable to the pipeline's own production. Because only a portion of the sale, rather than the sale itself, would be attributable, the Commission reasoned that a sale downline could not be a first sale under the terms of the NGPA unless it were comprised exclusively of pipeline produced gas. However, treating the intracorporate transfer as a first sale would mean that that sale would be wholly attributable to the pipeline's production.

The Commission was also concerned that applying NGPA prices to sales to customers downline would supplant the state's traditional jurisdiction over retail sales by interstate pipelines, intrastate pipelines and local distribution companies. However, if the NGPA prices attached to the intracorporate transfer by the producer then the state's jurisdiction over retail sales would remain intact. The only change would be that the cost of the gas to the pipeline or distribution company would be the NGPA price. Jurisdiction to set the final retail charge would remain with the state. Although the retail price would reflect the NGPA cost of gas, that change is consistent with Congress' desire to establish a uniform price for producers of both intrastate and interstate gas.

Finally, the Commission was concerned that applying NGPA prices to the sale downline would disturb its traditional method of establishing the cost of gas sold by the pipeline. The Commission feared that the new downline sale price would be limited to the maximum NGPA price rather than reflecting its traditional costs-plus-a-reasonable-return methodology. This would create difficulty in factoring in the costs of operating and maintaining the pipeline. However, if the NGPA prices were applied to the intracorporate transfer, then the Commission's practice would not be disturbed.

Treating the intracorporate transfer as a first sale would establish the "cost" of the pipeline's own production to the pipeline at NGPA prices, just as the cost of independently produced gas to the pipeline is calculated. This cost could then be factored in as a component of the pipeline's costs, precisely as the Commission has done under the cost-of-service method. This is in fact what the Commission proposed to do in Order No. 98 and what it had previously done when it applied area and national rates to both independent and pipeline production.

FERC, however, refused to treat this intracorporate transfer as a first sale because it maintained that no sale took place. FERC also noted that because no contracts govern the intracorporate transfer, certain administrative problems would result. Although the legislative history convinces us that Congress intended the intracorporate transfer to be treated as a first sale, we respect the Commission's determination that administration would be difficult. We note, however, that in Order No. 98 the Commission would apply NGPA prices to this same intracorporate transfer. This assures us that the Commission's authority to issue regulations to govern this area will enable it to overcome these difficulties.

### V.

Relying on the language, purposes and history of the NGPA, we hold that Congress clearly intended for any production attributable to an "interstate pipeline, intrastate pipeline or local distribution company, or any affiliate thereof" to be accorded first sale status under the NGPA and that Congress contemplated that the intracorporate transfer of pipeline production to the pipeline would be treated as the first sale. We therefore vacate Order No. 58. Because we hold that the Commission lacked authority to set prices for interstate pipeline production under the NGA, we also vacate Order No. 98 without reaching the issues of arbitrary pricing raised here.[4]

Orders Nos. 58 and 98 are

VACATED.

---

4. Northwest Pipeline Corporation petitioned for review of the Commission's decision in Order No. 98 to terminate its "special circumstances exception," which would have allowed a pipeline producer to seek a higher price than the nationwide rate set by the Commission under the NGA. The effect of our holding with respect to Order No. 58 is that the price for pipeline production will now be set under the NGPA. The parties have noted in their briefs that there is an ongoing rulemaking on the subject of such special relief under the NGPA. The issue raised by Northwest is therefore not yet ripe for review.