NEW JERSEY STATE CHAMBER OF COMMERCE; Chemical Industry Council of New Jersey; New Jersey Business and Industry Association; Chemical Specialties Manufacturers Association, Inc.; Merck & Co., Inc.; Magnesium Elektron, Inc.; CP Chemicals, Inc.; Chem-Mark, Inc.; Exxon Chemical Americas, a division of Exxon Chemical Company, a division of Exxon Corporation; Schering Corporation; Essex Chemical Corporation; Ingersoll-Rand Company; and Shell Chemical Company, a division of Shell Oil Company, Plaintiffs,

v.

Robert E. HUGHEY, Commissioner of Environmental Protection; J. Richard Goldstein, M.D., Commissioner of Health; and William Van Note, Acting Commissioner of Labor, and the State of New Jersey, Defendants,

and

Joseph H. Rodriguez, Public Advocate of the State of New Jersey, et al., Defendant-Intervenors.

FRAGRANCE MATERIALS ASSOCIATION OF the UNITED STATES; Flavor and Extract Manufacture's Association; Bush Boake Allen, Inc.; Dragoco, Inc.; Firmenich, Inc.; International Flavors and Fragrances, Inc.; Isogenics, Inc.; H.J. Kohnstamm & Co., Inc.; V. Mane Fils, Inc.; Noville Essential Oil Company, Inc.; Polarome Manufacturing Corp.; Roure Bertrand Dupont, Inc.; Takasago USA, Inc.; Ungerer & Co.; and Universal Fragrance Corporation, Plaintiffs,

v.

William VAN NOTE, Acting Commissioner of Labor for State of New Jersey; J. Richard Goldstein, Commissioner of Health for State of New Jersey; Robert E. Hughey, Commissioner of Environmental Protection for State of New Jersey, Defendants,

and

Joseph H. Rodriguez, Public Advocate of the State of New Jersey, et. al., Defendant-Intervenors.

Civ. A. Nos. 84–3255, 84–3892.

United States District Court, D. New Jersey.

Jan. 3, 1985.

**608**

Farrell, Curtis, Carlin & Davidson by John J. Carlin, Jr., Lisa J. Pollak, Morris-town, N.J., for plaintiffs in Civ. A. No. 84–3255.

Lawrence A. Casha by Frank C. Azzinaro, Towaco, N.J., and Daniel R. Thompson, and McKenna & Shea by John P. McKenna, Washington, D.C., for plaintiffs in Civ. A. No. 84–3892.

Irwin I. Kimmelman, Atty. Gen. of N.J. by Michael S. Bokar, Deputy Atty. Gen., Trenton, N.J., for defendants in Civ. A. Nos. 84–3255 and 84–3892.

Joseph H. Rodriguez, Public Advocate by Richard A. Goldberg, Sharon A. Treat, Asst. Deputies Public Advocate, Dept. of the Public Advocate, Division of Public Interest Advocacy, Trenton, N.J., and Public Interest Law Center of Philadelphia, Philadelphia, Pa., and Reitman, Parsonnet, Maisel & Duggan by Bennett D. Zurofsky, Newark, N.J., for defendant-intervenors in Civ. A. Nos. 84–3255 and 84–3892.

DEBEVOISE, District Judge.

### I. *The Proceedings*

These two consolidated actions challenge the New Jersey Worker and Community Right to Know Act (the "Right to Know Act"), N.J.S.A. 34:5A–1, et seq., primarily on the ground that the Act is preempted by regulations or standards promulgated under the federal Occupational Safety and Health Act of 1970 (the "OSH Act"),[1] 29 U.S.C. §§ 651, et seq. Plaintiffs further contend that certain of the Right to Know Act's disclosure requirements constitute an unreasonable exercise of the State's police power and will result in a taking of trade secrets without due process of law.

The plaintiffs in Civil Action No. 84–3255 (the "Chamber of Commerce Action") are the New Jersey State Chamber of Commerce, three chemical and business associa-

---

1. I have tried to minimize the use of initials and acronyms. To assist the reader of this opinion, the following will be used from time to time:

   *CAS Numbers*—Chemical Abstract Service registry numbers.

   *DEP*—New Jersey's Department of Environmental Protection.

   *EPA*—The federal Environmental Protection Agency.

   *FIFRA*—Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136, et seq.

   *MSDS*—Material Safety Data Sheets required under the New Jersey Right to Know Act.

   *OSHA*—Federal Occupational Safety and Health Administration.

   *OSH Act*—Occupational Safety and Health Act of 1970.

   *SIC*—Standard Industrial Classification.

tions, and eight pharmaceutical and chemical companies. Defendants in that action are New Jersey's Commissioner of Environmental Protection, Commissioner of Health, Acting Commissioner of Labor, and the State of New Jersey. Plaintiffs ask for injunctive and declaratory relief. They seek an order directing the defendant Commissioners to comply with the provisions of § 18 of the OSH Act (defining federal preemption), 29 U.S.C. § 667, and enjoining the State of New Jersey from enforcing the obligations of the Right to Know Act. Plaintiffs seek a declaratory judgment that § 18 of the OSH Act precludes the New Jersey Commissioners from enforcing the obligations of the Right to Know Act in light of OSHA's Hazard Communication Standard, 29 C.F.R. § 1910.1200, and that the Right to Know Act is, on its face, unconstitutional and preempted by § 18 of the OSH Act and the Hazard Communication Standard.

After defendants in the Chamber of Commerce Action answered, plaintiffs moved for a preliminary injunction against enforcement of the Right to Know Act. A hearing was held on November 15, 1984.

The plaintiffs in Civil Action No. 84–3892 (the "Fragrance Materials Association Action") are two associations, the members of which are engaged in the manufacture and sale of fragrances and fragrance materials, and thirteen corporations which compound, mix, blend and/or manufacture fragrances or their ingredients. The defendants are the three New Jersey Commissioners who are the defendants in the Chamber of Commerce Action.

Plaintiffs in the Fragrance Materials Association Action seek to enjoin enforcement of the Right to Know Act. After defendants answered plaintiffs moved for summary judgment on Count I (alleging preemption) and on Count II (alleging deprivation of trade secrets without just compensation) or, in the alternative, for a preliminary injunction against enforcement of the Right to Know Act. Plaintiffs' motion was heard on December 10, 1984.

The two cases were consolidated prior to the November 15 and December 10 hearings. The Public Advocate of the State of New Jersey and twenty-nine unions, environmental organizations and other interested groups had moved to intervene. I granted the motion. The intervenors cross-moved for a partial summary judgment in their favor dismissing Counts I and II of the complaint in the Fragrance Materials Association Action. The intervenors as well as the original parties participated in the two hearings.

This opinion addresses all of the pending motions.

## II. *The Facts*

A. *The Right to Know Act*: On August 29, 1983 New Jersey's Governor signed the Worker and Community Right to Know Act, N.J.S.A. 34:5A–1, et seq., which became effective August 29, 1984.

Defendants submitted affidavits of numerous persons having experience and expertise in the fields of chemical substances and occupational and community hazards resulting from such substances. Included among the affidavits were governmental officials having responsibilities for workplace or community protection from chemical hazards, physicians and scientists whose careers have been devoted to treating or preventing illnesses caused by dangerous substances and persons familiar with the problems of fire fighting at industrial sites.

Taken together their affidavits demonstrate the rationale for the Right to Know Act. New Jersey, one of the nation's smallest states, is also one of the most densely populated. It has a high concentration of industry in general and of chemical manufacturers and processors in particular. Since World War II the number of available chemicals has grown extraordinarily, there now being approximately 50,-000 different chemicals used in industry. Many of these are hazardous. Exposure to these hazardous substances can take place in the plant where they are used or processed; the community can be exposed through emission in the air, through acci-

dental leakage from the plant or through lawful and unlawful disposal outside the plant. Exposure can and does result in debilitating or fatal illness, particularly cancer, lung ailments, sterility and birth defects.

Workers in a plant are often unaware of the dangerous substances with which they deal, or, if they are aware, they may not be advised of the precautions they should take. Often employers are unaware of the dangerous nature of the materials in their plants. The affidavits recite instances in which doctors seeking to treat an employee after exposure to a chemical substance have been unable to do so because the employer is either unable or unwilling to identify the substance.

Further, inhabitants of communities surrounding industrial complexes do not know the nature of chemical vapor to which they are exposed nor do they know the possible hazards which exposure entails. Public health officials cannot advise them because they, too, quite often do not have the necessary information. While some industrial concerns go to great pains to educate and inform both their employees and public officials of the chemical substances in their plants, others do not. Lacking such cooperation there was little that public officials could do to protect citizens from the existence of harmful substances.

In particular fire fighting organizations were often unable to obtain precise information concerning the substances with which they might have to deal in the event of a plant fire. Further, when fires occurred, there was often no way in which firemen could tell quickly what substances were burning in the plants. This information might be vital both to know how to deal with the fire itself and to safeguard firemen and other persons in the area.

New Jersey enacted the Right to Know Act to meet this congeries of problems arising in the workplace and extending into the community at large. The purpose is reflected in the Act's legislative findings and declarations, N.J.S.A. 34:5A–2, and in the statement of purpose contained in the regulations implementing the Act. N.J. A.C. 8:59–1.2.

The Right to Know Act requires that the New Jersey Department of Environmental Protection (the "DEP") develop both an environmental hazardous substance list and an environmental survey designed to enable employers to report information about environmental hazardous substances at their facilities. N.J.S.A. 34:5A–4.

The Department of Health is required to develop four things: (1) a workplace hazardous substance list which must include (a) any substance regulated by the federal Occupational Safety and Health Administration ("OSHA") under 29 C.F.R., Part 1910, subpart z, (b) any environmental hazardous substance and (c) any other substance which the Department determines poses a threat to the health or safety of an employee; (2) "a special health hazard substance list comprising hazardous substances which, because of their known carcinogenicity, mutagenicity, teratogenicity, flammability, explosiveness, corrosivity, or reactivity pose a special hazard to health and safety, and for which an employer shall not be permitted to make a trade secret claim;" (3) a workplace survey designed to facilitate the reporting by employers of hazardous substances at their facilities; and (4) a hazardous substance fact sheet for each hazardous substance on the workplace hazardous substance list. N.J.S.A. 34:5A–5.

The Act required that within 5 days of August 29, 1984 (the effective date of the Act), the environmental survey and the workplace survey be distributed to each employer subject to the Act. N.J.S.A. 34:5A–6. Within 90 days of receipt of the workplace survey the employer is required to complete it and send copies to the Department of Health, the county health department, the local fire department and the local police department. Within the same time the employer is required to complete the environmental survey and send a copy to the DEP and to the county health department and to send "pertinent sections of

the survey" to the local police and fire departments. N.J.S.A. 34:5A–7.

Upon receipt of a completed workplace survey from the employer, the Department of Health must transmit to the employer a fact sheet (prepared by the Department, as noted above) for each hazardous substance reported by the employer on the workplace survey. N.J.S.A. 34:5A–8. The Department must maintain a file of completed workplace surveys, require that every employer update its survey annually and make available copies of the surveys and related hazardous substance fact sheets upon request. N.J.S.A. 34:5A–10. The DEP must maintain a file of completed environmental surveys, require that every employer update its survey each year, and make copies of the surveys available upon request. N.J.S.A. 34:5A–9.

Each employer must maintain at its facility a central file in which it shall retain the workplace survey, appropriate hazardous substance fact sheets and, if appropriate, the facility's environmental survey. Notice of availability must be posted and employee access must be provided. N.J.S.A. 34:5A–12. In addition the Right to Know Act contains detailed provisions mandating an education and training program for employees, "which shall be designed to inform employees in writing and orally of the nature of the hazardous substances to which they are exposed in the course of the employment and the potential health risks which the hazardous substances pose." The employer must also train his employees "in the proper and safe procedures for handling the hazardous substances under all circumstances." N.J.S.A. 34:5A–13.

The Act also contains detailed provisions for labeling containers containing hazardous substances and pipelines. "Within six months of the effective date of this act, every employer shall take any action necessary to assure that every container at his facility containing a hazardous substance shall bear a label indicating the chemical name and Chemical Abstracts Service number of the hazardous substance or the trade secret registry number assigned to the hazardous substance." Further, "[e]mployers shall be required to label pipelines only at the valve or valves located at the point at which a hazardous substance enters a facility's pipeline system, and at normally operated valves, outlets, vents, drains and sample connections designed to allow the release of a hazardous substance from the pipeline." N.J.S.A. 34:5A–14.

The Act goes on to provide that "[w]ithin two years of the effective date of this act, every employer shall take any action necessary to assure that every container at his facility [whether or not it contains a hazardous substance] bears a label indicating the chemical name and Chemical Abstracts Service number of the substance in the container ... or the trade secret registry number assigned to the substance." If a container contains a mixture of substances, the employer's label must similarly identify the five most predominant substances contained in the mixture. The labeling provisions effective after two years will not apply to any substance constituting less than 1% of a mixture unless the substance is present at the facility in an aggregate amount of 500 pounds or more. Provisions concerning the labeling of pipelines parallel those applying to the period beginning six months after the effective date of the Act. N.J.S.A. 34:5A–14.

The Right to Know Law deals with the problem that disclosure of chemical substances in the workplace and the labeling of containers may result in the disclosure of trade secrets of an employer. Procedures are established whereby an employer may claim that specified information disclosed in an environmental survey or in a workplace survey or through the labeling process constitutes a trade secret. If the DEP or the Department of Health disputes the trade secret claim an administrative hearing and subsequent court review are available. Until the dispute is resolved and after a trade secret claim is either accepted by the agency or favorably adjudicated, confidentiality must be preserved except that disclosure may be made to a physician when such information is needed for medi-

cal diagnosis or treatment. N.J.S.A. 34:5A-15.

Trade secret protection is not accorded, however, to substances on the special health hazard substance list, "for which an employer shall not be permitted to make a trade secret claim" N.J.S.A. 34:5A-5b. The Department of Health has prepared a workplace hazardous substance list consisting of 2051 items. Of these 835 are on the special health hazard list. Of the 835 substances 335 are carcinogens, mutagens (causing genetic mutations) and teratogens (causing birth defects) and are considered special health hazard substances in a pure form or in a mixture at a concentration of 0.1% or greater. The other 500 substances are flammable, explosive, reactive or corrosive substances and are considered special health hazard substances in a pure form or in a mixture at very high concentrations, e.g., 80%, 90%, 95%. *See* Rosenman Affidavit, Defendants' App. at A19.

The DEP and the Department of Health have adopted regulations implementing the Right to Know Act, N.J.A.C. 7:1G-12, et. seq., N.J.A.C. 8:59-1.1, et seq. As required by the Act, environmental surveys and workplace surveys have been distributed to each employer in the State subject to the Act, including the manufacturing and processing concerns which are plaintiffs in the Chamber of Commerce and the Fragrance Materials Association cases. Unless enforcement of the Act is enjoined the employers must complete and file them as required by the Act.

B. *The OSH Act:* In 1970 Congress enacted the Occupational Safety and Health Act of 1970 ("OSH Act"). 29 U.S.C. §§ 651, et seq. Finding that personal injuries and illnesses arising out of work situations imposed a substantial burden on interstate commerce, Congress sought to assure working persons safe and healthful working conditions by, among other things, (i) authorizing the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce, (ii) exploring ways to discover latent diseases, establish-

ing causal connections between diseases and work environmental conditions and conducting research relating to health problems, (iii) providing medical criteria which will assure that no employee will suffer diminished health, functional capacity, or life expectancy as a result of his work experience, (iv) providing for the development and promulgation of occupational safety and health standards, (v) encouraging the States to assume the fullest responsibility for the administration and enforcement of their occupational safety and health laws, and (vi) providing for appropriate reporting procedures. 29 U.S.C. § 651.

The OSH Act imposes a duty on each employer to furnish his employees a place of employment free from recognized hazards and to comply with occupational safety and health standards promulgated under the Act. 29 U.S.C. § 654.

The Secretary of Labor is given the power and the duty to promulgate, modify or revoke occupational safety or health standards in order to implement the purposes of the OSH Act. 29 U.S.C. § 655. An "occupational safety and health standard" is defined as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8).

In particular 29 U.S.C. § 655(b)(7) provides in part:

(7) Any standard promulgated under this subsection shall prescribe the use of labels or other appropriate forms of warning as are necessary to insure that employees are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions of safe use or exposure. Where appropriate, such standard shall also prescribe suitable protective equipment and control or technological procedures to be used in connection with such hazards and shall provide for monitoring or measuring employee exposure at such locations

and intervals, and in such manner as may be necessary for the protection of employees....

In order to carry out the purposes of the Act the Secretary of Labor is authorized to enter, inspect and investigate places of employment. 29 U.S.C. § 657(a). Further, the Secretary of Labor, in cooperation with the Secretary of Health, Education and Welfare:

> ... shall issue regulations requiring employers to maintain accurate records of employee exposure to potentially toxic materials or harmful physical agents which are required to be monitored or measured under section 655 of this title. Such regulations shall provide employees or their representatives with an opportunity to observe such monitoring or measuring, and to have access to the records thereof. Such regulations shall also make appropriate provision for each employee or former employee to have access to such records as will indicate his own exposure to toxic materials or harmful physical agents. Each employer shall promptly notify any employee who has been or is being exposed to toxic materials or harmful physical agents in concentrations or at levels which exceed those prescribed by an applicable occupational safety and health standard promulgated under section 655 of this title, and shall inform any employee who is being thus exposed of the corrective action being taken.

29 U.S.C. § 657(c)(3).

The statute mandates that information obtained under the OSH Act "shall be obtained with a minimum burden upon employers, especially those operating small businesses. Unnecessary duplication of efforts in obtaining information shall be reduced to the maximum extent feasible." 29 U.S.C. § 657(d). The Secretary of Labor and the Secretary of Health, Education and Welfare are directed to prescribe rules and regulations which they deem necessary to carry out their responsibilities under the OSH Act. 29 U.S.C. § 657(g)(2).

C. *OSHA's Hazard Communication Standard:* On November 25, 1983 OSHA published its final Standard for Hazard Communication. 48 Fed.Reg. 53,340–348.[2] The Standard is codified at 29 C.F.R. §§ 1910.1200, et seq. Its purpose is stated to be:

> ... to ensure that the hazards of all chemicals produced or imported by chemical manufacturers or importers are evaluated, and that information concerning their hazards is transmitted to affected employers and employees within the manufacturing sector. This transmittal of information is to be accomplished by means of comprehensive hazard communication programs, with are to include container labeling and other forms of warning, material safety data sheets and employee training.

29 C.F.R. § 1910.1200(a).

The Standard is applicable to all employers in Standard Industrial Classification ("SIC") Codes 20–39, which in general terms includes manufacturing operations. The plaintiff enterprises in the consolidated cases are included in SIC Codes 20–39. 29 C.F.R. § 1910.1200(b)(1).

Chemical manufacturers and importers are required to evaluate chemicals produced in their workplaces or imported by them to determine if they are hazardous. Criteria and methods of evaluation are prescribed in the Standard. Information concerning any physical or health hazards determined to be present must be transmitted to "downstream" manufacturers by product labels on containers leaving the workplace and by accompanying material safety data sheets ("MSDS"). After evaluation of workplace chemicals, employers are required to develop and implement a written hazard communication program for their workplaces "which at least describes how the criteria specified ... for labels and other forms of warning, material safety

---

**2.** There are pending in the Court of Appeals for the Third Circuit petitions challenging the validity of OSHA's Hazard Communication Standard.

*United Steelworkers of America, et al. v. Thorne G. Auchter,* Docket Nos. 83–3554, et al.

data sheets and employee information and training will be met...." 29 C.F.R. § 1910.1200(d) and (e).

1. *Hazard Determination/Material Safety Data Sheets:* The primary responsibility for hazard evaluation is placed on chemical manufacturers and importers of hazardous chemicals. 29 C.F.R. § 1910.-1200(d)(1). Each chemical must be evaluated for its potential to cause adverse health effects, as well as its potential to pose physical hazards (e.g. flammability). The Standard provides general criteria for the manufacturer or importer to follow in evaluating the scientific evidence on whether a chemical may cause an adverse health effect and provides specific rules for the evaluation of chemical mixtures. 29 C.F.R. § 1910.1200(d)(2), (5); *see* 48 Fed.Reg. 53,-347 (Appendix B to Standard). In addition, the Standard establishes, by reference to several enumerated lists, a "floor list" of approximately 2300 hazardous chemicals. 29 C.F.R. Part 1910, Subpart Z; 29 C.F.R. § 1910.1200(d)(3), (4).

The MSDS for each hazardous chemical is the primary means, under the Standard, for transmitting comprehensive hazard information. 48 Fed.Reg. 53,305. The MSDS will include the physical and chemical characteristics of the substance, its health and safety hazards, including symptoms of exposure, recommended maximum exposure limits, primary routes of exposure, generally applicable safe handling and use precautions and control measures. 29 C.F.R. § 1910.1200(g). Employer-purchasers will receive copies of the MSDS's produced by manufacturers for all hazardous chemicals in their workplace and will be required to ensure that they are readily accessible to all employees. *Id.* Workplace container labels designed to communicate to employees by message, word, picture or symbol, the dangers of the chemicals in the container, are keyed to the readily-available MSDS.

2. *Labeling:* Chemical manufacturers, importers and distributors must ensure that containers of hazardous chemicals leaving the workplace are appropriately labeled, and all manufacturing employers must similarly label in-plant containers. 29 C.F.R. § 1910.1200(f)(1), (4). The labels on containers leaving the workplace must include at least the "identity" of the chemical, appropriate hazard warnings and the name and address of the manufacturer, importer or other responsible party. *Id.*

The labeling requirement under the Standard expressly takes into account the applicability of other existing statutes or substance-specific health standards regulating hazardous materials. 29 C.F.R. § 1910.-1200(a)(4). The Standard also directs that if labels already applied by a manufacturer, distributor or importer comply with the Standard's requirements, additional labels need not be applied. 29 C.F.R. § 1910.-1200(f)(9).

The Standard recognizes the practical problems of labeling within a plant and allows a flexible approach. 48 Fed.Reg. 53,336. For example, if there are a number of stationary work containers which have similar contents (such as reactor vessels) within a work area, the employer may post signs or placards which convey the required hazardous information rather than individually labeling each piece of equipment. Employers may also use written material other than labels (e.g. process sheets, batch tickets, etc.) on stationary process equipment, as long as it is readily accessible to employees working in the area. In addition, the Standard as promulgated does not require labels on piping and support systems, the most costly items in any plan. 29 C.F.R. § 1910.1200(c). This resulted in an estimated cost savings of approximately 58% to 67% of the initial compliance cost and 70% of the annual cost associated with earlier proposals for the Standard which required such labeling. 48 Fed.Reg. 53,325.

3. *Employee Training:* The Standard specifies the subjects which must be covered by employee training programs. 29 C.F.R. § 1910.1200(h)(2).

4. *Trade Secrets:* The Standard permits a chemical manufacturer, importer or em-

ployer to withhold the specific chemical identity from the MSDS if:

(i) The claim that the information withheld is a trade secret can be supported;

(ii) Information contained in the material safety data sheet concerning the properties and effects of the hazardous chemical is disclosed;

(iii) The material safety data sheet indicates that the specific chemical identity is being withheld as a trade secret; and

(iv) The specific chemical identity is made available to health professionals, in accordance with the applicable provisions of this paragraph.

29 C.F.R. § 1910.1200(i)(1).

If a treating physician or nurse determines that a medical emergency exists and that the chemical identity of a hazardous chemical is necessary for emergency or first aid treatment, the entity claiming a trade secret must immediately disclose the identity of the chemical. In non-emergency situations more complex procedures are required to obtain the identity of the chemical. These procedures are designed to provide greater protection to the trade secret. 29 C.F.R. § 1910.1200(i)(2) and (3).

D. *The Alleged Burdens Imposed by the Right to Know Act:* Plaintiffs in the Chamber of Commerce Action have submitted a number of affidavits of corporate executives and scientists describing the effect of having to comply both with OSHA's Hazard Communication Standard and the Right to Know Act.

Labeling of pipelines, including valves, vents, inlets, drains and sample connections would, according to plaintiffs, impose enormous burdens in manpower and money. Some plants, for instance, have thousands of locations which would require labeling. In view of the fact that different materials may be sent through the pipes, it might be necessary to change the labels continually.

It is claimed that the requirement that within two years containers and pipelines be labeled with the chemical names and Chemical Abstract Service registry numbers ("CAS numbers") of the five predominant substances contained in or passing through them (whether hazardous or not) imposes a heavy financial burden and serves to confuse employees and others with an excess of information.

Double sets of labels, reports and training programs will be required to meet both the federal and state requirements.

Out-of-state suppliers may be unwilling to provide the information which New Jersey requires be placed on the labels, particularly when trade secrets are involved. This will result in loss of essential suppliers or an inability to comply with the Right to Know Act provisions.

The education program requirement imposes a far greater burden on employers than the federal standard because it must include extensive information about the Right to Know Act and about all hazardous substances in a plant whether or not in the individual employee's workplace.

The most serious consequences of the Right to Know Act which plaintiffs foresee is the threatened loss of trade secrets. Unlike the federal standard, under which employers can claim trade secret protection for all hazardous substances, the Act mandates disclosure of the presence of all special health hazard substances. There are 835 substances in this category, and as to them no employer may seek trade secret protection. In many instances, plaintiffs assert, the identification of the presence of one of these substances will necessarily result in the disclosure of valuable trade secrets which heretofore have been protected from competitors and others. It is not necessary to know the quantity of the substance involved. According to plaintiffs the mere presence of the substance often constitutes the trade secret.

Defendants have sought to answer plaintiffs' analysis of the effects of the Right to Know Act, and at least to some extent have done so in the affidavits submitted on their behalf (see in particular Rosenman Affidavit, Defendants' Appendix at A13, et seq.). They note that there are many exceptions to the labeling requirements, such as containers labeled pursuant to various federal

acts (other than the OSH Act) and that alternate methods of labeling are permitted in special situations. Defendants demonstrate that many state requirements correspond with or complement the federal requirements and that employer compliance with one set of requirements can be used to meet the other set.

Defendants seek to minimize the loss of trade secrets risk which the Right to Know Act creates. There are affidavits which state that using available technology it is almost always possible to ascertain the component substances of a product, and therefore the listing of chemical substances will not disclose anything which a competitor or other interested person could not ascertain in any event. Further, defendants note that of 50,000 chemicals which are commonly used, only 835 are in the category of special health hazard substances. All the rest are entitled to trademark protection under the Right to Know Act. Finally, defendants argue that these 835 substances are capable of causing extraordinary harm to workers and others, and that if there is a conflict between the employer's right to protect his trade secrets and a worker's need to know the identity of the substance to prevent or treat injury or disease, the interest in maintaining trade secrets must give way to the more important health needs.

It is impossible on the present record to measure with any precision the extent of the increased burden imposed by the Right to Know Act, although given the additional requirements of the Act the extra burden must of necessity be considerable. I suspect that not even an extended evidential hearing would enable a court to determine the extent of the risk to trade secrets which would result from implementation of the Right to Know Act. Plaintiffs discussed their trade secrets in only the most general terms. Even when dealing with a claim of a single trade secret, the determination of the validity of the claim is a difficult process at best. Discussion of a threat to all of the asserted trade secrets of all industrial concerns in New Jersey is necessarily imprecise and nebulous. Simi-

larly defendants' assertions that there is little danger to this undifferentiated mass of trade secrets cannot be totally convincing. The most that can be said is that there is a likelihood that the disclosure requirements will involve a substantial risk of the loss of some trade secrets by some of New Jersey's employers.

### III. *Conclusions of Law*

██ A. *Jurisdiction:* Plaintiffs in the Fragrance Materials Association Action assert federal jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337(a) (commerce regulation). Plaintiffs in the Chamber of Commerce Action assert federal jurisdiction under 28 U.S.C. § 1331, 42 U.S.C. § 1983 (deprivation of federal rights under color of state law) and 28 U.S.C. § 2201 (Declaratory Judgment Act). The latter statute, of course, is not an independent basis of jurisdiction and simply provides for a remedy when a federal court already has jurisdiction.

Defendants urge that under the rule set forth in *New Jersey State AFL–CIO v. New Jersey,* 747 F.2d 891 (3d Cir.1984) and *Exxon Corp. v. Hunt,* 683 F.2d 69 (3d Cir.1982), *cert. denied,* 459 U.S. 1104, 103 S.Ct. 727, 74 L.Ed.2d 952 (1983), this court lacks jurisdiction notwithstanding the fact that plaintiffs rely on a federal statute and regulation as the bases of their claims. Plaintiffs' principal claim is that the Right to Know Act has been preempted by the federal Hazard Communication Standard. In *Exxon* plaintiffs sought a declaratory judgment that the existence of the federal Superfund Act, 42 U.S.C. § 9631, preempted New Jersey's Spill Act, N.J.S.A. 58:10–23.11a, and exempted them from paying the tax imposed by the Spill Act. The Court of Appeals ruled that "a complaint seeking a declaration that federal law preempted state regulations did not raise a federal question" and that "a declaratory judgment complaint does not state a cause of action arising under federal law when the federal issue is in the nature of a defense to a state law claim," 638 F.2d at 73.

In *State AFL–CIO* plaintiffs sought a declaratory judgment that the Employment Retirement Income Security Act of 1974 (ERISA) preempted four New Jersey statutes regulating "closed panel" dental insurance plans. Affirming the district court's dismissal of the action for lack of subject matter jurisdiction, the Court of Appeals held that the case did not arise under federal law since the declaratory relief was sought "only to stave off action by New Jersey against plan providers which might be taken under the state statute." 747 F.2d at p. 892.

I do not believe these cases are controlling here. Rather, *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) governs the question of jurisdiction. The issue in that case was the extent to which ERISA preempted New York's Human Rights Law and Disability Benefits Law. In a footnote the Supreme Court stated:

> Here, ... companies subject to ERISA regulation seek injunctions against enforcement of state laws they claim are pre-empted by ERISA, as well as declarations that those laws are pre-empted. *It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights.* See *Ex Parte Young*, 209 U.S. 123, 160–162, 52 L.Ed. 714, 28 S.Ct. 441 [454–455] (1908). A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 [28 U.S.C.S. § 1331] to resolve.... (Emphasis added.)

*Id.* 463 U.S. at —— n. 14, 103 S.Ct. at 2899 n. 14, 77 L.Ed.2d at 500, n. 14.

Plaintiffs here seek injunctive as well as declaratory relief, thus distinguishing the case from *Exxon* and *State AFL–CIO*. This may appear to be a distinction without a difference, but at least in this Circuit the

Supreme Court's ruling in *Shaw* gives significance to the distinction.

Further, plaintiffs' trade secret claims allege a deprivation of property without due process of law, a different claim altogether from those advanced in *Exxon* and *State AFL–CIO*. Thus I conclude that the instant cases arise under federal law and that jurisdiction lies in this court.

B. *Preemption:* The principal contention of plaintiffs in both actions is that OSHA's Hazard Communication Standard preempts the Right to Know Act. It must be noted in this regard that when OSHA issued the Standard it limited the Standard's coverage to employers in the manufacturing sector, SIC codes 20 through 39. 29 C.F.R. § 1910.1200(b)(1). It reserved "the right to separately regulate other segments in the future." 48 Fed.Reg. 53,284–87, 53,334. The Right to Know Act covers both the manufacturing and other sectors. In this section of this opinion I am proceeding on the assumption that preemption, if applicable, would apply only to state regulations affecting manufacturing businesses covered by the federal Standard, i.e., employers within SIC codes 20 through 39.

■ It is hornbook law that under the Supremacy Clause of the Constitution, Art. 6, cl. 2, when a state statute conflicts with a federal statute which has preempted the subject matter of the legislation, the state statute must give way. *Maryland v. Louisiana*, 451 U.S. 725, 746–47, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981). Preemption may be either express or implied and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977).

In the present case Congress addressed the preemption question in the statute itself, and therefore the question is one of statutory interpretation, not implied preemption. Section 18 of the OSH Act provides:

> (a) Nothing in this chapter shall prevent any State agency or court from

asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under section 655 of this title.

(b) Any State which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 of this title shall submit a State plan for the development of such standards and their enforcement.

29 U.S.C. § 667(a), (b).

The OSH Act sets forth criteria to be applied when a state plan is submitted to the Secretary of Labor for approval. Among the criteria is the requirement that when state standards are applicable to products distributed or used in interstate commerce they be "required by compelling local conditions and do not unduly burden interstate commerce." 29 U.S.C. § 667(c)(2). New Jersey has not sought federal approval of its Right to Know Act.

The language of § 18 of the OSH Act provides "both a broad grant of power to the states and a limitation on the exercise of that power." *Florida Citrus Packers v. State of California*, 549 F.Supp. 213, 216 (N.D.Cal.1982). Section 18(a) has been consistently interpreted by OSHA and the courts to bar the exercise of state jurisdiction over issues addressed by an OSHA standard, even where the state law may arguably be more stringent or where OSHA has not explicitly addressed a provision. *See, e.g., Five Migrant Farm Workers v. Hoffman*, 136 N.J.Super. 242, 246, 345 A.2d 378 (Law Div.1975); *Stanislawski v. Industrial Comm.*, 99 Ill.2d 36, 75 Ill. Dec. 405, 457 N.E.2d 399 (1983); *Columbus Coated Fabrics v. The Industrial Comm. of Ohio*, 1973–74 O.S.H.Rep. (BNA) ¶ 16,-832 (S.D.Ohio 1973), *appeal dismissed*, 498 F.2d 408 (6th Cir.1974).

The Hazard Communication Standard itself expressly provides that it "is intended to address comprehensively the issue of evaluating and communicating hazards to employees in the manufacturing sector, and to preempt any state law pertaining to this subject." 29 C.F.R. § 1910.1200(a)(2). Comparing the Right to Know Act and the Standard, it is apparent that the Right to Know Act deals, to a very great extent, with hazard communication in the workplace, the identification of hazardous substances, labeling, and workplace training and educational programs, the precise issues covered by the Standard. Unless one of the reasons defendants advance for not applying preemption controls, it would appear that the Right to Know Act is subject to the express preemptive effect of the federal statute and administrative Standard. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152–54, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982).

Defendants and intervenors first argue that preemption is unwarranted because federal jurisdiction under the OSH Act is limited to *occupational* safety and health, whereas the Right to Know Act is directed to the health and safety of the *general public*. As described above the New Jersey statute and regulations are designed to protect not only workers but also inhabitants of the state who live near industrial or other facilities and to enable fire and health officials to protect the community from health risks and other hazards. However, to accomplish these objectives the Right to Know Act deals with precisely the same subjects in the workplace as are regulated by the OSHA Standards. The Act clearly asserts jurisdiction over occupational safety and health issues as to which a federal standard is in effect. Consequently § 18(b) of the OSH Act mandates submission of the Act and the regulations implementing it to the Secretary of Labor for approval. This approval has not been obtained or even sought.

The fact that the Right to Know Act has purposes in addition to occupational health and safety does not insulate it from the preemption provisions of the OSH Act. In *Perez v. Campbell*, 402 U.S. 637, 651–52, 91 S.Ct. 1704, 1712–13, 29 L.Ed.2d 233

(1971), the Supreme Court rejected as "aberrational" the doctrine that:

> [S]tate law may frustrate the operation of federal law as long as the state legislature in passing its law had some purpose in mind other than one of frustration. Apart from the fact that it is at odds with the approach taken in nearly all our Supremacy Clause cases, such a doctrine would enable state legislators to nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law.

■ It may well be, as defendants and intervenors assert, that the Right to Know Act is not inconsistent with the federal Standard and in fact is the kind of legislation which furthers the OSH Act objectives and is therefore permitted under that Act. Congress, however, has required that a determination in this regard must be made in the first instance by the Secretary of Labor and that until such a determination is made an OSHA standard preempts the area of regulation.

Defendants and intervenors have relied heavily on *Pacific Gas & Elec. v. State Energy Res. Conservation & Dev't Comm'n,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). In that case the Atomic Energy Act expressly permitted states to regulate for "purposes other than protection against radiation hazards." *Id.* 461 U.S. at 190, 103 S.Ct. at 1716, 75 L.Ed.2d at 752, *quoting* 42 U.S.C. § 2021(k). No prior approval of a federal agency was required, as in the case of state regulation of an area covered by an OSHA Standard. Thus, inquiry into the purposes of the State enactment was made relevant by the express terms of the federal statute. The Supreme Court reasoned that:

> At the outset, we emphasize that the statute does not seek to regulate the construction or operation of a nuclear powerplant. It would clearly be impermissible for California to attempt to do so, for such regulation, even if enacted out of non-safety concerns, would nevertheless directly conflict with the NRC's exclusive authority over plant construction and operation. ... the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states. When the federal government completely occupies a given field or an identifiable portion of it, as it has done here, the test of preemption is whether "the matter on which the state asserts the right to act is in any way regulated by the federal government."

*Id.* 461 U.S. at 212–213, 103 S.Ct. at 1726, 75 L.Ed.2d at 770. The New Jersey Right to Know Act seeks, among other things, to regulate employer activity in the workplace in regard to the dissemination of information on hazardous substances. This is an issue expressly preempted by the federal Standard.

■ Defendants argue that the preemption provisions of the OSH Act are inapplicable because the Hazards Communication Standard is not a "standard", rather it is a regulation. Both § 18(a) and § 18(b) use the term "standard". Subsection (a) permits a state to act on an issue "to which no *standard* is in effect." Subsection (b) requires a state to obtain federal approval of any of its regulatory requirements relating to an occupational safety or health issue "with respect to which a Federal *standard* has been promulgated."

The OSH Act provides for the adoption of standards promulgated pursuant to 29 U.S.C. § 655(b) and it provides for the promulgation of regulations pursuant to 29 U.S.C. § 657(g)(2). Defendants urge that the Hazard Communication Standard does not fall within the statutory definition of "standard", namely, a rule "which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life...."

**620**

29 U.S.C. § 655(b)(5). Relying on *Louisiana Chemical Ass'n v. Bingham*, 657 F.2d 777 (5th Cir.1981), defendants contend that the Hazard Communication Standard, not being "hazard specific", is a regulation—any rule the Secretary of Labor "may deem necessary to carry out [his] responsibilities under [the Act] ...." 29 U.S.C. § 657(g)(2).

I do not believe that defendants' position is well taken. In § 3(8) of the OSH Act, an occupational health and safety standard is defined as a standard "which requires conditions or the adoption or use of one or more practices, means, methods, operations or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8). Section 6(b)(5) of the OSH Act, 29 U.S.C. § 655(b)(5) provides for the development of occupational health and safety standards addressing toxic materials and harmful physical agents. Finally, § 6(b)(7) of the statute requires that a standard promulgated thereunder "prescribe the use of labels or other appropriate forms of warning ... as are necessary to ensure that employees are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions of safe use or exposure." Taken together, these statutory provisions support the status of the Hazard Communication Standard as a § 6(b) standard.

In addition, the legislative history of the OSH Act clearly supports the validity of the Hazard Communication Standard as a § 6(b) standard. At the time of the passage of the OSH Act, Congress, in discussing what would constitute a § 6(b) standard, stated:

> Standards promulgated under this procedure would include requirements regarding the use of labels or other forms of warning to alert employees to the hazards covered by the standard and to provide them with necessary information regarding proper methods of use or exposure and appropriate emergency treatment, where appropriate, such standards

would also prescribe protective equipment and other control measures, as well as, in the case of toxic substances or harmful physical agents, requirements for monitoring conditions or measuring employee exposure as may be necessary to protect employee's health.

1970 U.S.Code Cong. & Admin.News 5177, at 5183.

■ Furthermore, the position of the Agency is clearly set forth in its comments to the Standard, 48 F.R. 53320, and should be accorded the significant weight which courts give to interpretations of an implementing agency. *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); *Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.*, ——— U.S. ———, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). OSHA's comments distinguish the Standard from a § 8(g) regulation on the basis that (1) the Hazard Communication Standard requires evaluation of chemical hazards, development of material safety data sheets, and the establishment of educational programs, thereby requiring affirmative action on the part of manufacturers, importers, distributors and employers as to practices, means and methods; (2) the core of the requirements contained in the Standard pertain only to hazardous chemicals; and (3) the labeling and warning requirements of the Standard fit clearly within the language of § 6(b)(7). These characteristics provide a marked contrast to the record keeping provisions that were held to be a § 8(g) regulation, and not a standard, in *Louisiana Chem. Ass'n v. Bingham*, 657 F.2d 777 (5th Cir.1981). In *Bingham*, the Court held that the record access rule which was (1) aimed primarily at the detection of health risk patterns, not at the correction of that risk, (2) which involved a voluntary record creation program, and (3) incorporated thousands of substances into the rule that probably did not present any risk of injury, was not a § 6 Standard. *Id.* at 781.

Thus I conclude that the Hazard Communication Standard is a "standard" and that,

therefore, the preemption provisions of 29 U.S.C. § 667 are applicable.

■ Defendants further urge that the preemption provisions of the OSH Act are not applicable at the present time because certain of the provisions of the Standard do not become effective until a later date in order to give employers an opportunity to put themselves in compliance. Section 18(a) of the OSH Act permits states to act concerning issues as to which no standard is "in effect". The language of the Act and common sense require the conclusion that a standard is "in effect" when it is issued (November 25, 1983, in this case) even though for practical reasons employers are given additional time to prepare to meet the requirements of the standard. Given this interpretation Section 18(a) complements Section 18(b) which requires federal approval of state action if the state seeks to regulate any issue as to which a federal standard "has been promulgated". The Hazard Communication Standard is in effect for preemption purposes.

C. *The Extent of Preemption:* The new Standard covers only employers in the manufacturing sector, SIC codes 20 through 39. The employer plaintiffs in both the Chamber of Commerce Action and the Fragrance Materials Association Action are in the manufacturing sector covered by those codes. The Chamber of Commerce and perhaps some of the other trade association plaintiffs include in their membership employers who are not covered by those codes. Plaintiffs in the Chamber of Commerce Action urge that the preemption doctrine precludes application of the Right to Know Act to these groups as well as to employers in the manufacturing sector.

Plaintiffs advance two arguments in support of their position. First, they urge that non-inclusion of other employers in the Standard represents a deliberate decision by OSHA that these other employers should not be subject to hazard communication requirements, and that imposition of the Right to Know Act requirements would

defeat this decision. Second, and somewhat inconsistently, plaintiffs argue that issuance of a federal standard regulating these other sectors is imminent, and that in such a situation state regulations should not intrude. Neither argument is at all persuasive.

■ Once again, the question is governed by the express preemption provision of the OSH Act. Section 18(a) affirmatively confers jurisdiction on the states to deal with any occupational safety or health issue as to which no OSHA standard is in effect. No OSHA hazard communication standard is in effect for non-manufacturing employers. Consequently New Jersey is free to act as to those employers.

The fact that OSHA may intend to adopt a standard covering non-manufacturing employers is of no moment. Federal approval of state occupational safety and health standards under Section 18(b) of the OSH Act is required only when a federal standard on the subject "has been promulgated". No federal standard has been promulgated covering employers in the non-manufacturing sectors. Consequently federal approval of state regulation of employers in those sectors is not required.

■ The defendants urge that preemption does not apply to those provisions of the Right to Know Act which are necessary to carry out the non-workplace purposes of the Act, namely, the provisions designed to assist emergency response services, to enforce compliance with environmental laws and regulations, to provide the public with information concerning toxic substances used in their communities and emitted into the environment, and to assist health professionals and others in diagnosing, treating and preventing adverse health effects from exposure to toxic substances.

Defendants would exempt from preemption the statutory and regulatory requirements for hazardous substance lists, the surveys, the fact sheets and the labeling provisions.[3] There seems little question

---

**3.** The specific provisions of the Right to Know Act which defendants urge not be considered

but that New Jersey could enact legislation and regulate employers in order to achieve the non-workplace objectives to which defendants refer. Unfortunately, in the present case the non-workplace regulatory plan is superimposed upon a regulatory foundation which was designed to and does cover precisely the same occupational health and safety issues as are the subject of the OSHA Hazard Communication Standard. The workplace and non-workplace regulatory schemes are inextricably intertwined. The fact that this regulatory base also serves other ends does not save it from preemption. To hold otherwise would permit ready nullification of the Section 18 preemption provision.

It would be otherwise if a state were to adopt a statute and regulations directed as a bona fide effort solely to achieve the kind of non-workplace objectives to which defendants refer. In such a situation the OSH Act's preemption provisions would not be applicable. If in fact the non-workplace regulatory scheme impinged on an OSHA standard, the often difficult question of implied preemption would have to be addressed. But that is not the present case.

Thus the Hazard Communication Standard preempts the Right to Know Act only as the Act covers employers in SIC codes 20 through 39. However, as to those employers the Right to Know Act is preempted in its entirety.

D. *Trade Secrets*: Plaintiffs contend that the requirement of the Right to Know Act that employers disclose special health hazard substances without trade secret protection will deprive them of property without due process of law. This issue is academic for employers in the manufacturing sector because the trade secret provisions of the Right to Know Act along with its other provisions have been preempted by the federal standard. The issue is not academic, however, for other categories of employers who remain subject to the Right to Know Act.

It will be recalled that the Act contains a procedure by which employers may claim that the presence of designated substances constitutes a trade secret and that if the trade secret claim can be substantiated the substance will not be revealed in the labels and lists to which the public has access. It will also be recalled that, unlike the federal standard, the Right to Know Act provides for a category of particularly dangerous chemicals designated special health hazard substances, as to which employers are not allowed to obtain trade secret protection. Disclosure of these substances, plaintiffs assert, will result in the loss of trade secrets which may have been the product of substantial and costly research endeavors.

preempted even with respect to employers in the manufacturing sector are:

1. The requirement that the Department of Health and the DEP develop and publicly distribute lists of hazardous substances used, manufactured, stored, or emitted from workplaces in the state. These lists are (a) the environmental hazardous substances list, N.J.S.A. 34:5A–4a; (b) the workplace hazardous substances list, N.J.S.A. 34:5A–5a; and (c) the special health hazard substances list, N.J.S.A. 34:5A–5b.

2. The provision that disclosure of information concerning emissions into the environment, in particular the chemical name and CAS number, may not be withheld from the public by means of a trade secret claim. N.J.S.A. 34:5A–15h.

3. The provision that information concerning special health hazard substances, in particular the chemical name and CAS number, may not be withheld from the public by means of a trade secret claim. N.J.S.A. 34:5A–3s; 34–5A–3t; 34:5A–5b; N.J.A.C. 8:59–10.

4. The requirement that employers complete the environmental survey, N.J.S.A. 34:5A–7b; 34:5A–3k; the emergency service information survey, N.J.A.C. 7:1G–5; and the workplace survey, N.J.S.A. 34:5A–7a; 34:5A–3y, thereby listing those hazardous substances on the Department of Health and DEP lists that are present in their facilities or known to be emitted into the environment.

5. The requirement that, the Department of Health prepare, and publicly distribute, hazardous substance fact sheets describing the health effects of exposure to hazardous substances located in employers' facilities or known to be emitted into the environment. N.J.S.A. 34:5A–3n; 34:5A–10a.

6. The provision requiring employers to label containers with the chemical name and CAS numbers of the contents of the containers. N.J.S.A. 34:5A–14a; 34:5A–14b.

The forced disclosure of these trade secrets, it is said, will impair or destroy the employer's investment and endanger his ability to compete.

1. *Ruckelshaus v. Monsanto Co.*: Many of the questions involved in this aspect of the case were considered in the Supreme Court's decision in *Ruckelshaus v. Monsanto Co.*, — U.S. —, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). That case dealt with the disclosure of trade secrets of pesticide manufacturers who were required to register with federal agencies under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136, et seq. Three periods of time were pertinent to the Court's decision: (i) Prior to amendments enacted in 1972, FIFRA was silent with respect to the Environmental Protection Agency's ("EPA") use and disclosure of data submitted to it in connection with an application for registration. (ii) By virtue of the 1972 amendments to FIFRA, during the period from October 22, 1972 through September 30, 1978 a pesticide manufacturer submitting data was given an opportunity to protect its trade secrets from disclosure by designating them as trade secrets at the time of submission. Under FIFRA EPA was free to use nontrade secret data when considering the application of another registrant, provided EPA required the subsequent applicant to pay reasonable compensation to the original submitter. The statute, however, prohibited EPA from disclosing publicly, or considering in connection with the application of another, any data submitted by an applicant if both the applicant and EPA determined the data to constitute trade secrets. (iii) FIFRA was further amended effective October 1, 1978. Under that amendment pesticide registrants were granted a 10-year period of exclusive use for data on new active ingredients contained in pesticides registered after September 30, 1978. § 3(c)(1)(D)(i). All other data submitted after December 31, 1969 could be cited and considered in support of another application for 15 years after the original submission if the applicant offers to compensate the original submitter.

§ 3(c)(1)(D)(ii). Absent agreement of the parties on compensation, compensation is set by binding arbitration, which is not reviewable absent fraud or misrepresentation. Data not qualifying for either the 10-year period of exclusive use or the 15-year period of compensation may be considered by EPA without limitation. § 3(c)(1)(D)(iii). Finally the 1978 amendment provides for disclosure of all health, safety and environmental data to qualified requesters notwithstanding the prohibition against disclosure of trade secrets. Disclosure of information that would reveal "manufacturing or quality control processes" or certain details about deliberately added inert ingredients is not authorized unless "the Administrator has first determined that the disclosure is necessary to protect against an unreasonable risk of injury to health or the environment." §§ 10(d)(1)(A) to (C).

Monsanto Company was one of a small group of companies that invent and develop new active ingredients for pesticides and conduct most of the research and testing with respect to those ingredients. The development process may take 14 to 22 years, and it is usually that long before a company can expect any return on its investment. Monsanto instituted suit in the United States District Court against EPA's Administrator seeking injunctive and declaratory relief against the data-consideration and data-disclosure provisions of FIFRA, alleging, among other things, an unconstitutional taking of property without just compensation.

The District Court declared, among other things, that the statutory provisions for a 10-year period of exclusive use, the 15-year period of compensation and the use for health, safety and environmental purposes were unconstitutional. In reaching this result the District Court made the following determinations:

1. Monsanto possessed property right in the data it submitted.

2. The data consideration provisions contained in § 3(c)(1)(D) appropriated for

the benefit of Monsanto's competitors Monsanto's property rights.

3. Monsanto's property was being appropriated for a private purpose and this interference was much more significant than the public good that the appropriation might serve.

4. The operation of the FIFRA disclosure provisions constituted a taking of Monsanto's property, and the cost to Monsanto significantly outweighed any benefit to the general public from having the ability to scrutinize the data. The District Court appeared to believe that the public could derive the assurances it needed about the safety and effectiveness of a pesticide from EPA's decision to register the product and to approve the label.

5. The compulsory binding arbitration scheme contained in § 3(c)(1)(D)(ii) did not adequately provide compensation for the property taken.

6. A remedy was not available under the Tucker Act for the deprivations of property effected by §§ 3 and 10 of FIFRA.

On direct appeal the Supreme Court reversed and remanded for further proceedings. Both the holdings and the Court's step by step analysis bear critically on the present case.

The Court first addressed the question whether data of the kind which Monsanto submitted to EPA was a property interest protected by the Fifth Amendment's Taking Clause. It noted that property interests are not created by the Constitution but must stem from an independent source such as state law. After reviewing Missouri law (Monsanto being headquartered in that state), the Restatement of Torts, federal cases and other legal sources, the Court concluded:

> ... that to the extent that Monsanto has an interest in its health, safety, and environmental data cognizable as a trade-secret property right under Missouri law, that property right is protected by the Taking Clause of the Fifth Amendment.

—— U.S. at ——, 104 S.Ct. at 2874, 81 L.Ed.2d at 833.

The Court then addressed the question whether a taking occurs when EPA discloses the data or considers it when evaluating another application for registration. Noting that the Court has been unable to develop any set formula for determining when justice and fairness require that economic injuries caused by public action are to be deemed a compensable taking, and further noting that inquiry into whether a taking has occurred is an ad hoc factual inquiry, the Court stated:

> The Court, however, has identified several factors that should be taken into account when determining whether a governmental action has gone beyond "regulation" and effects a "taking." Among those factors are: "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." [Citations omitted.]

—— U.S. at ——, 104 S.Ct. at 2875, 81 L.Ed.2d at 834.

The Court found that the force of the third factor—interference with reasonable investment-backed expectations—"is so overwhelming, at least with respect to certain of the data submitted by Monsanto to EPA, that it disposes of the taking question regarding that data. The Court examined the expectation factor as it related to each of the three periods described above and reached a separate conclusion for each period.

With respect to the post September 30, 1978 period, the Court ruled that by reason of the provisions of the statute itself Monsanto had no reasonable expectation of non-disclosure:

> We find that with respect to any health, safety, and environmental data that Monsanto submitted to EPA after the effective date of the 1978 FIFRA amendments—that is, on or after October 1, 1978—Monsanto could not have had a reasonable, investment-backed expectation that EPA would keep the data confidential beyond the limits prescribed

in the amended statute itself. Monsanto was on notice of the manner in which EPA was authorized to use and disclose any data turned over to it by an applicant for registration.

— U.S. at ——, 104 S.Ct. at 2875, 81 L.Ed.2d at 834.

If, despite the data-consideration and data-disclosure provisions in the statute, Monsanto chose to submit the requisite data in order to receive a registration, it can hardly argue that its reasonable investment-backed expectations are disturbed when EPA acts to use or disclose the data in a manner that was authorized by law at the time of the submission.

— U.S. at ——, 104 S.Ct. at 2875, 81 L.Ed.2d at 835.

Answering Monsanto's contention that the requirement that a registrant give up its property interest in the data constitutes an unconstitutional condition on the right to a valuable governmental benefit, the Court noted that the federal government clearly has the power to regulate the marketing and use of pesticides and

> Thus, as long as Monsanto is aware of the conditions under which the data are submitted, and the conditions are rationally related to a legitimate government interest, a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking.

— U.S. at ——, 104 S.Ct. at 2876, 81 L.Ed.2d at 835.

Prior to the 1972 amendment, FIFRA was silent with respect to EPA's authorized use and disclosure of data submitted to it in connection with an application for registration. There was in existence another statute, the Trade Secrets Act, 18 U.S.C. § 1905, which imposed a criminal penalty for any federal employee who disclosed, in a manner not authorized by law, any trade secret information revealed to him during the course of his official duties. Notwithstanding the existence of the Trade Secrets Act, the Court held that:

> Thus, with respect to any data that Monsanto submitted to EPA prior to the effective date of the 1972 amendments to FIFRA, we hold that Monsanto could not have had a "reasonable investment-backed expectation" that EPA would maintain that data in strictest confidence and would use it exclusively for the purpose of considering the Monsanto application in connection with which the data were submitted.

— U.S. at ——, 104 S.Ct. at 2877, 81 L.Ed.2d at 837.

The Court came to a different conclusion with respect to data submitted during the period from October 22, 1972 through September 30, 1978. It will be recalled that during that period the statute gave a registrant the opportunity to protect its trade secrets from disclosure by designating them as trade secrets at the time of submission. By the very terms of the statute EPA was prohibited from disclosing publicly, or considering in connection with the application of another, any data which EPA and the applicant determined to constitute trade secrets. The Court held that "[t]his explicit governmental guarantee formed the basis of a reasonable investment-backed expectation. If EPA, consistent with the authority granted to it by the 1978 FIFRA amendments, were now to disclose trade-secret data or consider that data in evaluating the application of a subsequent applicant in a manner not authorized by the version of FIFRA in effect between 1972 and 1978, EPA's actions would frustrate Monsanto's reasonable investment-backed expectation with respect to its control over the use and dissemination of the data it had submitted." — U.S. at ——, 104 S.Ct. at 2878, 81 L.Ed.2d at 838.

Thus compensation was mandated for disclosure of any trade secrets submitted during the 1972–78 period when the statutory guarantee of secrecy was in effect. The Court observed that if negotiation or arbitration pursuant to § 3(c)(1)(D)(ii) were to yield just compensation, then Monsanto would have no claim against the government for a taking. Since no arbitration had yet been undertaken, "any finding that there has been an actual taking would be

premature." —— U.S. at ——, 104 S.Ct. at 2878, 81 L.Ed.2d at 839.

The Court summarized its "taking" rulings as follows:

In summary, we hold that EPA's consideration or disclosure of data submitted by Monsanto to the agency prior to October 22, 1972, or after September 30, 1978, does not effect a taking. We further hold that EPA consideration or disclosure of health, safety, and environmental data will constitute a taking if Monsanto submitted the data to EPA between October 22, 1972, and September 30, 1978; the data constituted trade secrets under Missouri law; Monsanto had designated the data as trade secrets at the time of its submission; the use or disclosure conflicts with the explicit assurance of confidentiality or exclusive use contained in the statute during that period; and the operation of the arbitration provision does not adequately compensate for the loss in market value of the data that Monsanto suffers because of EPA's use or disclosure of the trade secrets.

—— U.S. at ——, 104 S.Ct. at 2879, 81 L.Ed.2d at 839.

The Court concluded that any taking of private property that occurred by operation of FIFRA's data-disclosure and data-consideration provisions between October 22, 1972 and September 30, 1978, was a taking for public, not private, use, even though subsequent applicants may benefit from the disclosures of prior applicants.

Next, the Court cited the rule that equitable relief is not available to enjoin an alleged taking of private property for a public use when a suit for compensation can be brought against the sovereign subsequent to the taking. It rejected the District Court's determination that the Tucker Act remedy is unavailable for whatever taking may occur due to EPA activity pursuant to FIFRA. It held that where the operation of the data-consideration and data-disclosure provisions of FIFRA effect a taking of property belonging to Monsanto, an adequate remedy for the taking exists under the Tucker Act, and therefore the District Court erred in enjoining the taking. It further held that until Monsanto negotiates with a beneficiary of its data filings and until the controversy goes through arbitration Monsanto's claims with respect to the constitutionality of the arbitration scheme would not be ripe for adjudication.

In conclusion the Court stated:

We find no constitutional infirmity in the challenged provisions of FIFRA. Operation of the provisions may effect a taking with respect to certain health, safety, and environmental data constituting trade secrets under state law and designated by Monsanto as trade secrets upon submission to EPA between October 22, 1972, and September 20, 1978. But whatever taking may occur is one for a public use, and a Tucker Act remedy is available to provide Monsanto with just compensation. Once a taking has occurred, the proper forum for Monsanto's claim is the Claims Court. Monsanto's challenges to the constitutionality of the arbitration procedure are not yet ripe for review.

—— U.S. at ——, 104 S.Ct. at 2882-83, 81 L.Ed.2d at 843-44.

2. *Trade Secrets as Property*: In *Monsanto* the Court weighed FIFRA's data submission provisions against the requirements of the Fifth Amendment. In the present case, since state action is involved, Fourteenth Amendment due process requirements are implicated. However, the same criteria will control the outcome. Following the Supreme Court's rule in *Monsanto*, it must first be determined whether trade secrets which non-manufacturing employers submit pursuant to the Right to Know Act are property rights which are protected from governmental taking without just compensation.

▮ It is well established in New Jersey law, as in the law of most jurisdictions, that trade secrets are property rights. *E.g.*, *Sun Dial Corp. v. Rideout*, 16 N.J. 252, 108 A.2d 442 (1954), citing, *Restate-*

*ment of Torts*, § 757, comment 6; *cf.* N.J. S.A. 34:5A–3(u) (defining "trade secrets"). Although no case has been brought to my attention determining whether an uncompensated taking of a trade secret would violate the State Constitution, I see no reason why the New Jersey Supreme Court would not take the same approach as the United States Supreme Court in this regard.

The intervenors argue that since state law defines the property interest in question, when the Right to Know Act was enacted requiring disclosure of certain trade secrets, it simultaneously redefined the property interest in those trade secrets to exclude the right of secrecy. By so redefining the property right, compelled disclosure could not result in a taking of property.

This circular reasoning is unpersuasive. In *Monsanto* the Supreme Court refuted EPA's similarly strained argument that FIFRA had preempted state laws by declaring that trade secrets were not property rights:

> This argument proves too much. If Congress can "pre-empt" state property law in the manner advocated by EPA, then the Taking Clause has lost all vitality. This Court has stated that a sovereign, "by ipse dixit, may not transform private property into public property without compensation.... This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. [155] at 164, 66 L.Ed.2d 358, 101 S.Ct. 446 [at 452].

—— U.S. at ——, 104 S.Ct. at 2878, 81 L.Ed.2d at 838–839.

Trade secrets are property rights under New Jersey law. The Right to Know Act does not change these rights. These are rights which are protected from a taking without just compensation.

3. *Right to Know Act Disclosure as a Taking*: Still following the Supreme Court's lead in *Monsanto*, it must be determined whether the mandated disclosures of trade secrets under the Right to Know Act are "takings" which will trigger a right to compensation. I conclude that they are not.

The factors to be considered in determining whether particular governmental regulation effects a taking include the character of the governmental action, its economic impact and its interference with reasonable investment-backed expectations. Here the state is acting in an area of great public concern—worker health, environmental effects of hazardous substances in the workplace, community health and safety as it is effected by workplace chemical substances.

No evidence whatsoever has been submitted to show what effect, if any, the Right to Know Act trade secret provisions will have on employers in non-manufacturing sectors. The affidavits in this regard were submitted by employers in the manufacturing sector, and they were couched in vague and conclusory terms. Similarly the affidavits submitted by defendants and intervenors on the trade secret issue were highly generalized, utterly lacking in specificity.

As in *Monsanto*, reasonable investment-backed expectations of employers would seem to be determinative. On this question plaintiffs focus on and would have this court rely on the Supreme Court's ruling in *Monsanto* with respect to data submitted during the period from October 22, 1972 through September 30, 1978. However, as described above, the situation during that period was totally dissimilar from the situation in the present case. There during the 1972–1978 period the statute itself gave a registrant the opportunity to protect its trade secrets from disclosure. Registrants submitted trade secret data relying on that statutory guarantee. The 1978 amendment of FIFRA stripped away the protection of the guarantee. That is what the Supreme Court characterized as a taking.

Nothing like that has happened in New Jersey. There has been no antecedent peri-

od of disclosure during which the state committed itself to protecting trade secrets. The state has simply adopted a statute and regulations in economic and social areas in which it unquestionably has the power to act. As part of the regulatory scheme disclosure is required which may result in a loss of trade secrets.

This is just the situation which prevailed in the pre-1972 period which was addressed in *Monsanto*. Prior to the 1972 amendment FIFRA was silent with respect to EPA's authorized use and disclosure of registrants' data submitted to it. As in the case of New Jersey's Right to Know Act, there was no pre-existing legislation protecting trade secrets submitted by registrants. In such a situation the entity submitting data cannot have a "reasonable investment-backed expectation" that the agency receiving the data will maintain it in confidence. Consequently disclosure of the data is not a taking for which the state must pay compensation under the Fifth Amendment or the Fourteenth Amendment.

Employers may face the unpleasant choice of disclosing trade secrets or limiting or shutting down operations in New Jersey. This may be a more onerous dilemma than Monsanto faced, but the reasoning in the *Monsanto* case is nevertheless applicable here: as long as the employer is aware of the conditions under which the data are submitted and as long as the conditions are rationally related to a legitimate government interest, a submission under the Right to Know Act does not constitute a taking. —— U.S. at ——, 104 S.Ct. at 2876, 81 L.Ed.2d at 835.

4. *Other Trade Secret Contentions*: Having concluded that the absence of trade secret protection for certain substances does not constitute a taking requiring compensation, it is unnecessary to pursue other inquiries which the Court made in the *Monsanto* case. In particular, it is unnecessary to determine whether, as defendants assert here, New Jersey provides a means of com-

pensating persons whose trade secrets are taken in the course of implementing state regulatory programs, thus rendering injunctive relief inappropriate.

E. *Disposition of Motions*: The pending motions must be disposed of upon the basis of the foregoing conclusions.

Although the plaintiffs in the Chamber of Commerce Action originally moved for an order for a preliminary injunction against enforcement of the Right to Know Act, they later joined the motion for summary judgment filed by plaintiffs in the Fragrance Materials Association Action. Those plaintiffs moved for summary judgment (or, in the alternative, for a preliminary injunction) on Count I of their complaint (preemption) and on Count II of their complaint (trade secrets).

Fed.R.Civ.P. 56 provides that summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. I find that there are no genuine issues of fact insofar as the preemption and trade secret claims are concerned. The facts relating to preemption are established by the federal and state statutes and regulations and by the undisputed legislative history of those statutes. The facts relating to trade secrets are established by the same material and by the affidavits submitted by the parties.

Consequently summary judgment will be entered in both actions (i) declaring that the Right to Know Act is preempted by the OSH Act and the federal Hazard Communication Standard to the extent that the Right to Know Act affects employers in the manufacturing sector (SIC Codes 20–39) and (ii) permanently enjoining defendants from enforcing the Right to Know Act against such employers until the Act and regulations adopted pursuant to it have been approved by the Secretary of Labor pursuant to the provisions of the OSH Act.

As a practical matter this grant of summary judgment gives the plaintiffs in the Fragrance Materials Association Action full relief and should constitute a final judgment in that action. In the Chamber of Commerce Action there remain persons who are members of the association plaintiffs who are not employers in the manufacturing sector and consequently are not within the terms of the order for summary judgment which will be entered pursuant to the preceding paragraph.

In the Chamber of Commerce Action an order will be entered (i) denying plaintiffs' motion for summary judgment on the preemption issue insofar as the Right to Know Act affects employers who are not in the manufacturing sector and (ii) denying plaintiffs' motion for summary judgment on the trade secret issue. The motion of these plaintiffs for a preliminary injunction will be denied, since, for the reasons previously discussed, they have not shown any likelihood of prevailing on the merits.

The intervenors' cross-moved for summary judgment in the Fragrance Materials Association Action on the preemption and trade secrets claims. Their motion will be denied on the merits on the preemption claim and will not be disposed of on the trade secrets claim since summary judgment in favor of plaintiffs in that action makes it unnecessary to reach the trade secrets issue.

However, the intervenors are deemed also to have moved for summary judgment on these issues in the Chamber of Commerce Action. In that action (i) their motion for summary judgment on the preemption issue insofar as it relates to employers in the manufacturing sector will be denied; (ii) their motion for summary judgment on the preemption issue insofar as it relates to employers in the non-manufacturing sector will be granted; (iii) their motion for summary judgment on the trade secret claims will be granted.

The attorneys for plaintiffs are requested to submit appropriate forms of orders implementing this opinion.